(August 9, 1912.)

## STATE, Respondent, v. LUIS YTURASPE, Appellant.

[125 Pac. 802.]

CRIMINAL LAW—INFORMATION—QUASHING—PRELIMINARY EXAMINATIONS —NAME OF DEFENDANT—CERTIFICATION OF DEPOSITIONS—COMMITMENT—SUFFICIENCY OF EVIDENCE—ASSAULT—LOADED GUN.

(Syllabus by the court.)

1. Where a complaint was filed before a magistrate charging the defendant in the name of Louis Trespi, and such defendant was committed under the name of Lewis Uterspi, and an information was filed in the district court by the prosecuting attorney charging said defendant with the same crime in the name of Luis Yturaspe, and upon arraignment in the district court as provided by law he answered that Luis Yturaspe was his correct name, and it appears from the record that the person against whom the information was filed is the same person who was examined before the committing magistrate and committed, and that the offense was the same, the information should not be quashed upon the ground that the defendant never had a preliminary examination.

2. Under the provisions of sec. 7509, Rev. Codes, a complaint upon which a defendant is arrested and brought before a magistrate upon arraignment is not required to state the true name of the defendant, and neither is the defendant required to disclose his correct name, but such defendant may be prosecuted either under a fictitious name or his true name as appears by the evidence, and if the defendant is charged by a fictitious name and his true name is disclosed, then his true name should be inserted instead of the fictitious name; but if the true name is not disclosed and the fictitious name is used as the name of the defendant, such fact does not render such examination void.

3. The provisions of sec. 7576, Rev. Codes, as to the holding of an examination and the taking of testimony and certifying the same by the magistrate should be substantially complied with, and the certificate of the magistrate should show that the evidence taken by the stenographer in shorthand is certified by the stenographer as required by sec. 4, and that the same is true and correct; if taken in writing it must be subscribed and sworn to by the witness, and where a witness has given testimony under the statute upon preliminary examination, the testimony of such witness should be subscribed by the witness and sworn to before the magistrate, and after

all the evidence has been taken, then the magistrate under the statute is required to make a final certificate certifying that the requirements of this section of the statute have been complied with.

4. Evidence in this case examined, and *held* sufficient to support the verdict of the jury.

5. Under the provisions of sec. 6727, Rev. Codes, an assault consists not only in an unlawful attempt to commit a violent injury upon the person of another, but such unlawful attempt to commit a violent injury must be coupled with the present ability to commit such injury.

6. An instruction of the court to the jury upon a charge of assault "that a mere threat or menace to do violence, without any overt attempt to do violence, is not an assault; that an apparent effort to do violence without the existence of a present ability at the time to do the violence apparently attempted, would not be an assault, and that a gun is not a deadly weapon within the meaning of the statute unless it is loaded; consequently in this case, in order that you may find the defendant guilty, you must find beyond a reasonable doubt that he pointed and aimed a loaded gun at the complaining witness, James A. Percy, within a distance at which the gun if discharged could have committed a violent injury upon the person of the complaining witness, and that the defendant unlawfully attempted to commit such injury by means of such gun," is correct.

7. Upon a prosecution for assault if the evidence shows that the gun pointed at the assaulted party is unloaded, although threats are made, there is an absence of an intent to inflict a bodily injury, because the party charged can have no intent to inflict bodily injury, knowing at the time the gun is drawn that the same is unloaded and that no injury can be inflicted because of the inability to discharge the same. This rule means necessarily that the person must have an intent and also a present ability to commit the injury.

APPEAL from the District Court of the Third Judicial District for Ada County. Hon. John F. MacLane, Judge.

Prosecution for assault upon information. *Affirmed.*

Perky & Crow, for Appellant.

"The district court has no jurisdiction to try any person for an offense by information until the statute in regard to preliminary examinations has been complied with." (*State v. Braithwaite*, 3 Ida. 119, 27 Pac. 731.)

In construing statutes similar to ours, the courts have quite uniformly held that pointing an unloaded gun at another is not an assault. (*State v. Napper,* 6 Nev. 113; *People v. Sylva,* 143 Cal. 62, 76 Pac. 814; *State v. Godfrey,* 17 Or. 300, 11 Am. St. 830, 20 Pac. 625; *Chapman v. State,* 78 Ala. 463, 56 Am. Rep. 42; *Klein v. State* 9 Ind. App. 365, 53 Am. St. 354, 36 N. E. 763; *State v. Sears,* 86 Mo. 169; *Fastbinder v. State,.* 42 Ohio St. 341; *McConnell v. State,* 25 Tex. App. 329, 8 S. W. 275.)

D. C. McDougall, Attorney General, J. H. Peterson, and O. M. Van Duyn, Assistants, for Respondent.

At the time of his arraignment, and during the trial in the district court, no showing was made on the part of the defendant that the individual tried at the time of the preliminary examination and who was complained against there as Louis Trespi, and the defendant who was informed against in the district court and tried under the name of Luis Yturaspe, was not one and the same individual. It is not shown that any substantial right of the defendant was in any way infringed by this discrepancy in names. (*People v. Kelly,* 6 Cal. 210; *People v. Maroney,* 109 Cal. 277, 41 Pac. 1097.)

Many courts have held that an assault may be committed by pointing an unloaded gun at another. (*People v. Morehouse,* 6 N. Y. Supp. 763; *State v. Lightsey,* 43 S. C. 114, 20 S. E. 975; *United States v. Kierman,* 3 Cranch C. C. 435, Fed. Cas. No. 15,529; *Commonwealth v. White,* 110 Mass. 407.)

"Where the assault is alleged to have been committed with a firearm, the presumption is that the weapon is loaded, and the burden of proving it to be unloaded is on the defendant." (3 Cyc. 1053.)

There need not be a physical attempt to discharge a weapon against the person of another in order to constitute an assault. (2 Greenleaf, 73; *Beach v. Hancock,* 27 N. H. 223, 59 Am. Dec. 373; *Price v. United States,* 156 Fed. 950, 15 L. R. A., N. S., 1272, 13 Ann. Cas. 483, 85 C. C. A. 247; *People v. Montgomery,* 15 Cal. App. 315, 114 Pac. 792.)

STEWART, C. J.—On June 5, 1911, the prosecuting attorney of Ada county filed an information in the district court charging "that Luis Yturaspe is accused by this information of the crime of assault with a deadly weapon, which said crime was committed as follows: That said Luis Yturaspe on or about the 29th day of April, 1911, in the county of Ada, in the state of Idaho, did then and there wilfully, unlawfully and feloniously commit an assault upon the person of one James A. Percy with a deadly weapon, to wit: a certain rifle then and there loaded with powder and leaden bullets. . . . . "

On the 9th day of June, 1911, the defendant was arraigned upon said information, and upon inquiry from the court whether the name by which he was informed against was his true name he replied that it was, and upon said date the court fixed June 10, 1911, as the time for the defendant to plead to the information. On that date the defendant appeared with his counsel and filed a motion to quash and set aside the information, and this motion was overruled.

This motion is based upon a number of grounds; there are, however, only three grounds urged upon this appeal: First, that the defendant has never had a preliminary examination because the complaint filed in the justice's court before whom the examination was held charges an offense against one Louis Trespi and not this defendant; second, that the depositions upon which the information is based do not show that a public offense or crime was committed by the defendant, but, on the contrary, show that the defendant against whom the testimony was taken was Lewis Uterspi and not this defendant; third, that a portion of the depositions upon which the information is founded is not certified by the magistrate before whom the preliminary examination was had, and that such witnesses were witnesses for the defendant at said preliminary examination.

As a part of such motion there is an affidavit attached, made by defendant's counsel, which states: "That the criminal complaint on which the information against said defendant is founded and based  charges an offense against one Louis Trespi and against no other person; that the depositions

on which the information is based do not contain any evidence against said defendant by name.''

The case was tried to a jury and evidence taken and a verdict was rendered by the jury finding the defendant, Luis Yturaspe, guilty of assault with a deadly weapon. A motion for a new trial was made and overruled, and an appeal was taken from the judgment and also from the order overruling the motion for a new trial.

· The first error alleged is that the trial court erred in overruling the motion to set aside the information. There is no contention on the part of counsel for appellant that the defendant, who was informed against and tried under the name of Luis Yturaspe, and who in answer to the inquiry of the court, as provided by the statute, replied that such was his true name, is not the person against whom the complaint was filed in the justice's court under the name of Louis Trespi, and who was committed under the name of Lewis Uterspi, and in the absence of affirmative showing that the appellant, Luis Yturaspe, is not the same person as Louis Trespi or Lewis Uterspi who was charged in the complaint filed before the magistrate and who waived the preliminary examination, this court will assume that the information was filed against the same person charged in the magistrate's court and committed to the district court. The fact that the defendant was charged and committed under a fictitious or erroneous name would be no reason for quashing or setting aside the information, where it also appears that the information stated the true name of the defendant, and also the same name given and stated by the defendant to be his true name upon the court making inquiry of the defendant, under the statute, as to whether the name stated in the information was his true name. Sec. 7680, Rev. Codes, provides: ''When a defendant is indicted by a fictitious or erroneous name, and in any stage of the proceedings his true name is discovered, it must be inserted in the subsequent proceedings, referring to the fact of his being indicted by the name mentioned in the indictment.'' The mere fact that the appellant was charged before the magistrate by the wrong name would not prevent the

holding of a preliminary examination for the purpose of discovering the truth or falsity of the charge made against the person brought before the magistrate for such preliminary examination, or prevent the magistrate, at any time during the proceedings, from correcting the name and substituting the correct name for the fictitious and erroneous name.

The complaint filed with the magistrate holding the preliminary examination, under the provisions of sec. 7509, Rev. Codes, is required to contain the allegation in writing that the person has been guilty of some designated offense. When the defendant is brought before the magistrate upon arraignment, the magistrate is required to inform the person of the charge made against him and his right to counsel, and the magistrate is then required to hold the examination, and at the examination the magistrate is required to read to the defendant the depositions of the witnesses examined on taking the information, and witnesses may be examined, and if it appears from such examination that a public offense has been committed, and there is sufficient cause to believe the defendant guilty thereof, the magistrate issues his commitment to the district court.    There is nothing in the statute prescribing the proceedings requiring that the complaint charging an offense before the magistrate shall state the true name of the defendant or that the defendant shall give his true name.    So, before a magistrate on a preliminary examination, a party may be charged with a crime under any name, and when the true name of the defendant is discovered, if disclosed, it may be inserted in place of the fictitious name.    The appellant in this case was certainly not denied any constitutional or legal right by reason of the fact that the defendant, whose true name is Luis Yturaspe, was charged by information with an offense under the name of Luis Yturaspe, when it also appears that the defendant was charged before the magistrate in a written complaint with the same offense, under the name of Louis Trespi, and committed under the name of Lewis Uterspi.

The similarity of the names, though differently spelled, used as the name of the defendant before the magistrate and in

the complaint and in the commitment, and also in the informa-
tion filed in this case, would lead an ordinary person, un-
familiar with the pronunciation of such names, to pronounce
them as the same, and the similarity of such names is suffi-
cient to invoke the doctrine of *idem sonans.* We do not be-
lieve that the defendant was in any way prejudiced by reason
of the fact that he has been called by a different name in the
procedure leading up to the filing of the information, inas-
much as it affirmatively appears that the person of the de-
fendant was intended each time such name was used.

The second ground urged on this appeal, that the court erred
in overruling the motion to quash for the reason that the
committing magistrate failed to certify all the depositions or
all of the testimony taken before him, cannot be sustained.
The record made by the committing magistrate upon the pre-
liminary examination and transmitted to the clerk of the
district court and upon which the information was filed is not
in the record, and it will be presumed that the same was prop-
erly certified. (*People v. Grundell,* 75 Cal. 301, 17 Pac. 214.)

Sec. 7576, Rev. Codes, provides: "In all cases which must
afterward be investigated by the grand jury, or prosecuted
by information, the examination must be taken, unless the
person charged with the offense shall waive his right to such
examination, and cannot be unreasonably delayed by either
party and the testimony must be reduced to writing by the
magistrate, or under his direction, and authenticated in one
of the following forms: . . . . 4. The evidence, if taken by a
stenographer in shorthand, shall be transcribed by the stenog-
rapher and certified to as true and correct; if taken in writ-
ing it must be subscribed and sworn to by the witness, or if
he refuses to sign it, his reason for refusing must be stated
in writing as he gives it. 5. It must be signed and certified
by the magistrate."

This provision of the statute is mandatory in the sense that
an information charging a person with a crime cannot be
filed against a person without an examination held under the
provisions of this statute. (*State v. Braithwaite,* 3 Ida. 119,
27 Pac. 731.) And the provision with reference to holding

such examination and the taking of the testimony and certify-
ing the same by the magistrate should be substantially com-
plied with.

This question was considered by this court in the case of
*State v. Clark,* 4 Ida. 7, 35 Pac. 710, and this court said:
"It is true the order of commitment was not indorsed on the
depositions, as required by section 7579 of the Revised Stat-
utes, but that does not deprive the order of commitment of
its validity. The order was reduced to writing, and entered
in the official docket of the magistrate. That was sufficient.
. . . . The failure of the committing magistrate to indorse the
order of commitment on the depositions taken on the prelimi-
nary examination does not deprive the order of its validity,
or affect any substantial right of the defendant. . . . . In-
formalities or irregularities in the proceedings will not render
them invalid unless they actually prejudice the defendant, or
tend to his prejudice, in respect to a substantial right." And
in considering the certificate of the magistrate this court said:
"There was a substantial compliance with the law."

The certificate required under the provisions of sec. 7576 is
not in the record, and in the absence of such showing the court
will presume that the magistrate made the certificate required
by the statute. There is, however, in the record a bill of ex-
ceptions which contains the testimony of one witness to which
is attached a certificate of the magistrate, and in that certifi-
cate the magistrate certifies that "the foregoing annexed depo-
sition of Walter Thompson, a witness sworn and examined
in behalf of said plaintiff, the said State of Idaho, was taken
in the presence of Luis Yturaspe, the defendant in the above-
entitled cause, at my office in said precinct, on the 8th day
of May, A. D. 1911, and that said defendant, Luis Yturaspe,
was confronted with said Walter Thompson, the said witness,
in my presence, then and there sitting as a court to hear the
examination in said cause, during the time said witness,
Walter Thompson, was testifying and his said deposition was
being taken; and that said defendant, Luis Yturaspe, had
then and there an opportunity to cross-examine and question
said Walter Thompson, witness in behalf of said plaintiff, the

said state of Idaho, upon all matters brought out on the examination-in-chief. That before said witness Walter Thompson testified in said cause and his said deposition was taken, he, the said witness, in behalf of said plaintiff, was, by me in the presence of Luis Yturaspe, said defendant, duly sworn to tell the truth, the whole truth and nothing but the truth, I then and there having the power and lawful authority to administer said oath in that behalf. That the said deposition was taken in shorthand, and thereafter transcribed, and I certify that the annexed deposition is a true and correct record of the testimony given by said witness.''

The statute above does not require that the magistrate shall attach a separate certificate to the testimony of each witness; it does, however, require that the evidence taken by the stenographer in shorthand be certified by the stenographer, as required by subd. 4, and that the same is true and correct; if taken in writing, it must be subscribed and sworn to by the witness; and where a witness has given testimony under this statute upon preliminary examination, the testimony of such witness should be signed by the witness and sworn to before the magistrate; and after all the evidence has been taken, then the magistrate under the statute is required to make a final certificate, certifying in such certificate the compliance with the requirements of this section of the statute. (*State v. Clark*, 4 Ida. 7, 35 Pac. 710.) The only inference that can be drawn from the showing in this case is that the magistrate made· a separate certificate to the evidence of each witness, as is shown to have been done by the testimony of the witness Thompson, and if such certificate was made with reference to the other witnesses, the record would be complete, and the certificates sufficient under the statute. Whether all the evidence was certified up does not appear, because the complete record of the preliminary examination is not before us.

The next error assigned is the sufficiency of the evidence to support the verdict. It appears from the evidence that on the 29th of April, 1911, the appellant was in the employ of the Highland Livestock Company as foreman, and in charge of the handling of different bands of sheep owned by the

Highland Livestock Company, which were being trailed from
the corral and ranch of the company to the mountains, after
the marking of the lambs after lambing.   While the appellant
was marking lambs at the ranch, he was informed by one of
the herders who came to the corral that some men with dogs
had set upon the bands of sheep that were being trailed, and
that there was danger of two bands of sheep being mixed,
and that such sheep were at such time in the neighborhood
of the ranch of James A. Percy; that upon this information
being received by the appellant he and three men in his em-
ploy got on their horses, some of them armed with rifles and
six-shooters.   There is a conflict in the evidence as to just what
rifles or six-shooters these parties carried, but it is apparent
that at least two of them had rifles.   These three men rode
from the corral where they were marking lambs up to the
ranch owned by the Highland Livestock Company, where they
stopped for a short time for one of the party to saddle his
horse, which he had been riding barebacked.   They then pro-
ceeded up the road in the direction of the sheep, and after
they passed up the road they passed the Arrow stage, which
was going in the same direction.   After the passage of the
stage they turned off to the right of the road in the direction
of the scattered band of sheep.   The appellant had with him
a rifle which he carried in his hand.   James A. Percy and his
brother, Walter Percy, were repairing a fence up the road
about a quarter of a mile from the point where the appellant
and the men accompanying him turned to the right to go up
to where the sheep were.   The appellant and the men with
him rode up to the right of the road after leaving it until
they came within hailing distance of James Percy and his
brother, Walter Percy, and a man named Donnelly, who were
working about fifty feet to the left of the road, repairing
a fence upon the property of the Percys.   James Percy
shouted to the appellant to come down.   The appellant after
receiving the above request, and the men with him, turned and
rode down to the point near where the Percys were.   At that
time James Percy was advancing across the ditch in the direc-
tion of the road carrying a hammer in his hand, and the evi-

Idaho, Vol. 22—24

dence is somewhat conflicting as to what took place at that time. Gard, the stage-driver, testifies that the appellant and the three other parties with him passed the stage he was driving and afterward he saw them again up at Percy's and heard a good deal of language and abuse, and he says: "The defendant and three others who were with him reached the point where the Percys were about the same time I did. There was another gentleman with his rifle leveled at the Percys besides the defendant. I could not swear his rifle was cocked but he had it leveled on him at that time. The defendant had a gun or rifle leveled on Percy several minutes. Another party had a rifle leveled at Percy. The other parties who were armed with six-shooters was off on the ground. I saw the defendant and the other parties after they passed me until they arrived at the point where the Percys were. I was in sight of all of them all the time. They traveled at a pretty fast gait after they passed me. The defendant leveled the gun on Percy, he held it in a position to shoot. I don't know whether he held it to his shoulder; held it up like that. I heard Percy call to the defendant. When he rode up he had not done anything."

Patrick Mullen, a passenger on the stage driven by Gard, testifies that he saw the defendant in Highland Valley, and the defendant and three others were riding pretty fast and rode up higher than the road on the hill and turned down and made a short cut in front of the stage and made a halt. "I saw James Percy at the fence. When the defendant and the others rode down two of them had guns pointed and two others got off their horses. The parties appeared angry, of course. The horses of two of them who leveled guns at Percy were side by side and I saw the Percy boys coming at a quick walk toward them and the two others got off seemingly to hold them back and they kept their guns pointed until the man who done the talking ceased and they drove away. We just got there together. When we got up there and stopped the Percys were up about to where the defendants were. I thought as he came forward—but I am not certain what he said, I know he talked, I think I heard him say, 'You go back

into that hole.' I think I heard that word, I am not certain: my best recollection is he said to Percy, 'You get back into that hole.' The Percys kept on advancing toward the defendant up to the time he pointed the gun at them, the guns were pointed at that time; they came forward a little after the guns were pointed at them.''

Aaron Donnelly, who was working with the Percy brothers, testifies that Percy did not have any gun or weapon with him. ''Walter Percy did not have any gun or weapon. James Percy was on his ranch or land at the time the defendant and his party rode up there. The defendant and those with him on horseback ran right up there in a rush where the Percy boys were; they stopped suddenly. The Percys did not go away from the fence; they stayed right at the fence; they were working on it. I don't think there was any ditch there towards the road; I don't know of any, if I remember right. I was about 150 or 175 yards away. I could hear the Percys talking; I couldn't understand any of the conversation, I was too far off. I didn't hear the Percys shout and attract my attention. When the defendants reached the road the Percys were still mending fence, and the stage came up about that time.''

Walter Percy testifies: ''What attracted my attention to the defendant that day was that he came over there and drawed a gun on my brother. I was there when he drew the gun. Those three other men, his brother and these other two fellows accompanying him at the time. They came on horseback, with rifles, two of them had rifles and two of them had six-shooters. They came at a pretty lively gait. Before the defendant and the parties with him came there we were building fence, a barb-wire fence, rebuilding it, fixing it up. Donnelly was working there that day. I observed that the defendant cocked the gun at the time he held it on my brother. At that time he said—he throwed his gun down on him and told him to throw up his hands and said, 'You son-of-a-bitch, I will shoot you,' something of that kind; he throwed his gun down on him and cocked it at the same time. It was a Winchester rifle. At the time he cocked the gun and leveled it on my brother

he said he came to shoot him, and threw the rifle down on him, cussing; he done a good deal of cussing, called him a son-of-a-bitch, and said he had come there for that purpose, and he had his gun with him. One of the parties who got off their horses made a rush at me with his quirt, going to hit me with it. I backed up and raised the shovel up,—I had a shovel in my hand,—and he stepped back; he made a rush at me and said, 'I will get you some of these ———.' I just raised the shovel and he stepped back. My brother, James Percy, when the parties rode up, had a hammer in his hand, and I had a shovel; we were fixing the fence. My brother nor I had any other weapon there with us. I observed the stage drive up there on that day; I was acquainted with the parties who were on the stage. I judge the party who got off the horse who accompanied the defendant was off about 15 or 20 feet from me when he got off his horse and made the attempt to strike me. When the defendant and the other parties were approaching my brother on horseback, my brother hóllered to Luis, as they were coming that direction, something about the sheep being in there. He said to Luis, 'I want to see you a minute, Luis.' My land lies on both sides of the road with reference to the way the parties were coming; the road goes through my land. I said my brother had shouted to Luis to come over there, that he wanted to speak to him, but the defendant was coming in our direction when he shouted; he was up on the hill, kind of coming in an angling shape around the hill. He was probably 100 yards or more away. The defendant rode right across the road, and the minute he got across the road he throwed his gun down on him. My brother at that time had a hammer in his hand, nailing the staples, and I had a shovel in my hand. My brother was agin the fence, nailing staples. I stated he stepped across the gully, along the fence, and he walked up the fence and went across the gully and met the defendant, and the defendant threw the gun down on him. The stage was there at that time. The defendant was right in front of the leaders just below the road when he did this, right in front of the stage, and he cocked his gun; I heard it click—was, I judge, about 15 or 20 feet

from him when I heard it click.   Walter Thompson was there at that time on horseback; he came up just as the stage stopped.   The defendant spoke to my brother, told him to throw up his hands.   I couldn't say that he told him to stop, too; he said, 'Throw up your hands.'   He didn't say, 'Stay right there'; didn't say, 'Go back into that hole'; didn't say anything of that kind, only cussing him.   I noticed certain parties on the stage.   I noticed Mr. Gard and Mr. Mullens; they were right there when this affair happened, right there; I mean the stage come right there in the road.   Luis sat right on his horse right below the road right in front of the leaders.''

James Percy, the complaining witness, among other things testifies that he was acquainted with the defendant; had known him for five or six years, and saw him on the 29th of April, 1911.   He was riding along the road by the fence he was fixing.   There were with him three other men that were employed by him; they were traveling horseback.   "At that time the defendant throwed his gun on me, his Winchester, him and another man that was with him.   The two parties at that time leveled their guns at me.   I observed that the defendant cocked his gun at that time.   I couldn't say that the other fellow did, but Luis did his; he cocked it with his finger when he throwed it to his shoulder; he just pulled the trigger back.   The other party who pointed his gun was right alongside of the defendant, the horses standing side by side.   I didn't observe whether the other party's gun was loaded or cocked or not.   I did not have any gun with me on that day. I was about ten feet from the defendant about the time he had his gun in his hand and on horseback, pointed at me.   I spoke to the defendant when he was riding down the hillside toward me.   I saw him coming along the hillside and saw that he had a rifle in his hand, and I spoke to him then when I saw him coming in that way.   I told the defendant I wanted to see him.   I did not shout.   This was when he was probably 100 or 150 feet away coming directly toward me.   I stepped across that ditch; it is a little ravine; it has no ditch to it; it is just a little ravine, and I stepped across it.   I had a hammer in my hand; I held the hammer the same as any man

would hold a hammer, in my hand, right by the handle. I came toward the defendant; I stepped across the ravine toward him. The defendant, at that time, was right at the road; he came right across the road; he probably came a foot or two across the road. I heard the gun cocked, heard it click. I was away from the stage the length of a four-horse team when the gun was cocked. It was a Winchester rifle. I don't know how long the defendant remained pointing his gun at me, probably ten minutes, something about like that; he kept it at his shoulder all the time, kept it pointed directly at me; kept it cocked with his finger on the trigger. I didn't hear any report if he shot it. I saw him ride off.''

Walter Thompson testifies that he was riding along the road when he saw the defendant and the other parties riding and saw them stop at the ranch, and that they got some guns and then they rode on. ''I observed the defendant and the parties who were with him after they left the ranch. I seen them at the right at the fence line of James Percy, a little west of the Percy ranch—of the residence of the Percy ranch. I observed that the defendant had a gun, rifle, pointed toward James Percy like this, which was cocked. At the time the defendant rode up there, just at the time he rode up, I wasn't there until just a minute or two after he rode up; but when I did ride up they were stopped and then I heard him make a statement,—they were quarreling over the range; he made kind of threatening statements and all kinds of language. He threatened to kill him, that is what he said.''

The defendant in the case testified, among other things, that he was marking lambs at the corral, and there were with him Roman Bariassarra, Timoteo Obeita and Urbano Obeita and the sheep-herder who was herding the bunch. ''I went up the road that morning after they let me know what was going on. When I got this information I told the other boys helping me, 'You fellows come up with me and stop those fellows driving them sheep; if we don't they will have them mixed,' and they said, 'Yes, we will go.' First we went up past the ranch—when we passed the ranch we stopped at the ranch and got a saddle; one of them was riding bareback. We

were going fast when we were going up to the ranch-house. I went in the direction of the sheep after I left the road. I know James A. Percy there, the prosecuting witness. When I first saw him I been pretty near a quarter of a mile from him. I did not go over where he was; I was going in the direction of the sheep. He says, 'Luis,'—I didn't understand anything else. I didn't notice him wave his arms. When he yelled 'Luis,' I just turned around and went down where he was. When I got in by the road he quit his fence—working on the fence, coming toward me, passed a little wash-out, and came across that; he come right fast to me. At that time Percy came straight to me and when he got about 25 or 30 feet I told him, 'You stop, please'; he was coming on here, then I had my gun and I told him, 'You hold your hands up.' I was afraid he had something in his hands and I didn't know what it was, had it behind him; he raised his hands and I saw it was a hammer. I saw the stage pass,—passed the stage on the road, and the stage came there about 3 or 4 minutes after we got there, I think. As to what took place, just as I said, he stopped, I took my gun down and he tried to get in around after something, and I don't know who the other party was after, that told him to stay back. He said, 'I ain't got anything; I ain't got no gun here.' He went on and got something, nails or something, and went to the fence; then he was talking and he was right there at the fence, and I start in talking to him, and I told him to quit driving my sheep out in the free range, he didn't have any business to do that, and if he got anything to do agin them, he can do it by the law. And then he turn again to his fence. I told him to quit driving my sheep, he didn't have any business to do that. He told me I didn't have any business to keep those sheep there. He owned this land. I says, 'Well, you own that land, but I got to have some country to go through with the sheep.' I had a little Winchester rifle; it wasn't loaded. I did not say, 'You son-of-a-bitch, I will kill you'; I never said, 'I will shoot you.' I am positive I did not use that language. James Percy did not say anything to me before I told him to stop. The first time I told him to stop he didn't do it; after a

couple of steps more I told him to hold his hands up, because I was afraid of him.''

Roman Bariassara testified that he was one of the party who was with the defendant on April 29th. ''After we reached the place where the men were fixing the fence, Mr. Percy, the man here was coming toward Luis and Luis told him to stop. Percy at that time had some object or some tool in his hand. I could not tell when I first saw him what he had in his hand. Luis told him to raise his hands or stop, and then pointed the gun at him.''

Urbano Obeita testified to practically the same state of facts as the previous witness, and likewise Timoteo Obieta. There is some evidence as to the bad reputation of the prosecuting witness. This is the material and essential evidence that was introduced as to what took place leading up to and at the time the assault is alleged to have occurred.

The trial court instructed the jury: ''That a mere threat or menace to do violence without any overt attempt to do violence is not an assault; that an apparent effort to do violence without the existence of a present ability at the time to do the violence apparently attempted would not be an assault, and that a gun is not a deadly weapon within the meaning of the statute unless it is loaded; consequently, in this case, in order that you may find the defendant guilty, you must find beyond a reasonable doubt that he pointed and aimed a loaded gun at the complaining witness, James A. Percy, within a distance at which the gun if discharged could have committed a violent injury upon the person of the complaining witness, and that the defendant unlawfully attempted to commit such injury by means of such gun.

''You are instructed that a loaded gun is one that has powder and a missile in the barrel thereof; so that if the hammer was cocked, and the trigger pulled, the gun would be discharged. The mere fact that the rifle held by the defendant had cartridges in the magazine does not make it a loaded rifle.''

These two instructions were evidently based upon the provisions of sec. 6727, Rev. Codes, which provides as follows:

"An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another."

It would seem by the provisions of this statute that it was the intention of the legislature in defining the crime of assault that the offense should consist not only in an unlawful attempt to commit a violent injury upon the person of another, but that such unlawful attempt to commit a violent injury must be coupled with a present ability to commit such injury. Applying this statute to the evidence, and under the instructions of the trial court given to the jury, it was necessary for the jury to find from the evidence that the appellant made an unlawful attempt, coupled with a present ability to commit a violent injury on the person of the prosecuting witness, the person named in the information. The appellant contends that the evidence wholly fails to show that the drawing of the gun upon the prosecuting witness and the threatening to shoot him was an assault, because the only evidence introduced in the case with reference to the ability to commit the injury shows the gun was unloaded at the time it was drawn and the threat made. The only direct evidence, as we have shown, with reference to whether the gun was loaded at the time it was drawn and the threat made is the statement made by the defendant while upon the witness-stand, that the gun was not loaded. No other witness testified with reference to whether the gun was or was not loaded. If the statement made by the defendant was true and the gun was in fact not loaded, then the assault, though unlawful, was not coupled with a present ability on the part of the defendant to commit the injury.

The state of California has a statute identical with that of this state, and in construing that statute the supreme court of that state, in a well-considered decision rendered by the court in the case of *People v. Sylva,* 143 Cal. 62, 76 Pac. 814, says:

"That the defendant, while standing in the hall of the house, at a distance of over fifteen feet from Pistolesi, pointed a gun at him, in a position indicating an intention to shoot, saying to Pistolesi, 'I will shoot you if you don't get out of the house,' and that at that time the deputy sheriff, who was

near Pistolesi, closed the door. This constituted the only assault that was made, and these facts are substantially admitted by the defendant in his testimony. There was no attempt to use the gun as a weapon, otherwise than by firing it, and it was not in fact fired. The only serious dispute concerning any evidence in the case was over the questions whether or not the gun was loaded, and whether or not there was any attempt to discharge it. Under these circumstances, it must be conceded that, if the gun was not loaded, there was no assault, either with a deadly weapon or otherwise. Pointing an unloaded gun at another, accompanied by a threat to discharge it, without any attempt to use it except by shooting, does not constitute an assault. There is in such a case no present ability to commit a violent injury on the person threatened, in the manner in which the injury is attempted to be committed.''

The rule announced in *People v. Sylva* has been also announced in the following cases: *State v. Napper*, 6 Nev. 113; *State v. Godfrey*, 17 Or. 300, 11 Am. St. 830, 20 Pac. 625; *Chapman v. State*, 78 Ala. 463, 56 Am. Rep. 42; *Klein v. State*, 9 Ind. App. 365, 53 Am. St. 354, 36 N. E. 763; *State v. Sears*, 86 Mo. 169; *Fastbinder v. State*, 42 Ohio St. 341; *McConnel v. State*, 25 Tex. App. 329, 8 S. W. 275; Underhill on Evidence, secs. 352–354. All these cases clearly announce the rule to be that if the evidence shows that the gun pointed at the assaulted party is unloaded, although threats are made, there is not only an absence of a present ability to commit violent injury, but there is also an absence of an intent to inflict a bodily injury, because the party charged can have no intent to inflict bodily injury, knowing at the time the gun is drawn that the same is unloaded, and that no injury can be inflicted because of the inability to discharge the same. This rule of law necessarily means the proof must show an intent and also a present ability.

We think that the above is the correct rule of law, notwithstanding the fact that there are cases holding that the pointing of a rifle at another, with a threat to use it, is of itself evi-

dence of intent to inflict a violent injury and evidence of ability to commit such injury.

This brings us to a consideration of the question whether the evidence is sufficient to justify the jury in concluding that the rifle, drawn by the appellant upon the prosecuting witness, was loaded. In arriving at the conclusion that the rifle was loaded, the jury had a right to consider all the facts and circumstances of the case. The jury had a right to take into consideration the fact that the appellant was informed that persons were using dogs and chasing sheep trailing from the corral where the appellant was working up to the mountains, and the appellant's actions upon such information, and the calling to his assistance other parties and their equipment with firearms in going from the corral to the place where the sheep were, and the manner in which they proceeded there, and their approach to the place where the prosecuting witness was, and the opportunity of the appellant and the other parties to observe the fact that the prosecuting witness was engaged upon his own lands in a civil and quiet way, and that upon their approach the prosecuting witness came in their direction, and in doing so had no dangerous or deadly weapon upon his person; and that the prosecuting witness made no threats against the appellant or any other person, nor exhibited any dangerous or deadly weapon, or showed any disposition to assault or in any way injure the appellant or any of those accompanying him. There is no conflict whatever in the evidence that the prosecuting witness, at the time the gun was drawn and the threat made by the appellant, in no way provoked the appellant or made any threats or offered any insult to the appellant, or in any way intimidated or aggravated the appellant or made any demonstration or manifested any intent to do any injury to the appellant or those associated with him. The appellant drew his gun upon the prosecuting witness and commanded him to throw up his arms, and made the threat that he would shoot him.

There is but one conclusion, however, that can be drawn from the acts of the appellant from the time he first received the information and started to the place where the sheep were,

and that is, that the appellant was excited and angry and left his place prepared to make a violent assault, and that this condition of mental anger evidently existed from the time he left the corral until the instant when the defendant raised his gun and directed it toward the prosecuting witness and threatened to shoot him; the malice and feeling clearly appear, and that it was the intention of the appellant to execute his threat at the time he drew his gun. The appearance of the stage, however, at that moment, and the persons present, may have checked his recklessness and prevented the consequences that might follow. The conduct of the appellant on that occasion, and the language used, was such as cannot be justified by the law. The only conclusion that the prosecuting witness or the jury could arrive at, was that the appellant was looking for trouble, and that he was ready to do his share of the fighting when he drew his gun upon the prosecuting witness, and that he was the aggressor.

Considering all these facts and circumstances and the motive and purpose of the appellant from the time he left his corral to the time he pulled the gun on the prosecuting witness, the only reasonable and common-sense view that can be taken of such facts and the inference drawn therefrom establishes the conclusion that the gun was loaded; and the jury had a right to act upon these facts and circumstances and conclude that the statement made by the appellant that the gun was not loaded was not true. We do not think that this court would be justified in saying that the bald statement of the appellant that the gun was not loaded is sufficient to overcome the evidence offered on the part of the state showing facts and circumstances and the acts and conduct of the appellant.

It is apparent, when the evidence is carefully examined, that there was no hostile action on the part of the prosecuting witness which induced or justified the defendant in drawing the gun and making the threat to shoot, or that the acts of the prosecuting witness were of such a nature as to justify the defendant in acting in the manner in which he did act, in self-defense. The testimony of the persons who were on the stage and persons disinterested in any controversy between the

defendant and the prosecuting witness is all to the effect that the defendant and those accompanying him were armed and mounted, and that they rode rapidly down to the place where the prosecuting witness was, and that at that time the prosecuting witness was engaged in mending his fence on his own premises, and that there was no hostile demonstration or angry words or threats on the part of the prosecuting witness; and with such conditions existing the assault made by the defendant was certainly unprovoked and unjustifiable.

Mr. Underhill on Criminal Evidence, in sec. 6, lays down the general rule, which has been approved by this court in *State v. Levy,* 9 Ida. 483, 75 Pac. 227, as follows:

''Circumstantial evidence alone is enough to support a verdict of guilty of the most heinous crime, provided the jury might believe beyond a reasonable doubt that the accused is guilty upon the evidence. No greater degree of certainty in proof is required where the evidence is all circumstantial than where it is direct, for in either case the jury must be convinced of the prisoner's guilt beyond a reasonable doubt. They are bound by their oath to render a verdict upon all the evidence, and the law makes no distinction between direct evidence of a fact and evidence of circumstances from which the existence of the fact may be inferred. . . . . The first duty of the jury is to determine carefully upon all the testimony as stated by the witnesses whether the incriminating circumstances, from which they may infer guilt, are proved beyond a reasonable doubt. No general rule can or should be laid down as to what constitutes proof of circumstances in any particular case. Each case is a rule unto itself, and is to be determined upon its peculiar circumstances.''

It is perfectly apparent that the appellant was enraged toward the prosecuting witness from the time he left the corral up to the time he pulled the gun upon the prosecuting witness, and that he drew the gun in a way to indicate that the gun was loaded, because if the gun was not loaded, then his statement that he would shoot the prosecuting witness had no meaning whatever. His declaration at that time to the prosecuting witness was a clear and positive declaration that the

gun was loaded, and that fact controverts his statement upon the witness-stand, for the jury had a right to conclude that when he made such latter statement he was not telling the truth, especially in view of that statement and the other facts and circumstances of the case. All the facts and circumstances had a tendency to prove that the gun was loaded, and it was with the jury to say whether this evidence satisfied their minds beyond a reasonable doubt. Whether the gun was loaded was a question of fact for the jury, and in deciding this question the jury had the right to determine the credibility of the witness. We think there were facts and circumstances sufficient to justify the implied finding that the gun was loaded. (*People v. Montgomery,* 15 Cal. App. 315, 114 Pac. 792; *Crow v. State,* 41 Tex. 468.)

It is urged upon the part of the appellant that the trial court erred in refusing to give an instruction requested by the appellant as follows: "Before you are entitled to find the defendant guilty you must find from the evidence, beyond a reasonable doubt, that the gun pointed by defendant at James A. Percy was a loaded gun, and that there was an attempt on the part of the defendant to discharge it." The substance of this instruction was given by the court in the instruction to the jury as follows: "Consequently, in this case in order that you may find the defendant guilty, you must find beyond a reasonable doubt that he pointed and aimed a loaded gun at the complaining witness, James A. Percy, within a distance at which the gun, if discharged, could have committed a violent injury upon the person of the complaining witness, and that the defendant attempted unlawfully to commit such injury by means of such gun."

It will thus be seen that the instruction given tells the jury that they must find beyond a reasonable doubt that the defendant pointed and aimed a loaded gun at the complaining witness, which is in substance the same as the instruction requested by the defendant.

During the trial witnesses were produced by defendant who testified to the general reputation of the prosecuting witness in the community in which he resides for peace, and such

witnesses testified that it was bad.   This evidence is somewhat indefinite, and the defendant requested the court to give to the jury the following instruction: ''The fact, if it be a fact, that James A. Percy's reputation for peace and quietude in the community where he lived was bad, may also be considered by you as evidence tending to show that said Percy, and not the defendant, was the aggressor.''   This instruction was refused by the trial court, but the court did give to the jury the following instruction: ''The testimony offered as to the character of the complaining witness for peace and quietude is admitted for the purpose of assisting you in determining whether or not the complaining witness gave the defendant reasonable cause to apprehend such danger as to justify the defendant in drawing his gun on him, if he drew his gun on him, on the ground of self-defense, as defined in the foregoing instructions.   But if you find from the evidence that the defendant was the aggressor and sought the complaining witness and drew his gun upon him without any hostile demonstration on account of aggression on the part of the complaining witness, then such testimony as to the character of the complaining witness is immaterial, and affords no excuse to the defendant for drawing his gun upon him, if he did in fact so draw his gun.''

A comparison of these two instructions clearly shows that the trial court instructed the jury that the evidence with reference to the character of the prosecuting witness should be considered as tending to show whether the prosecuting witness or the defendant was the aggressor, and if the defendant was the aggressor, then the evidence was not material.   But it was material for the jury to consider, in determining the question as to whether the prosecuting witness or the defendant was the aggressor, and that was the essence of the request, in the instruction requested by counsel for defendant.   For this reason the court committed no error in refusing the request of the defendant.

The judgment, therefore, is *affirmed.*

SULLIVAN, J., Concurring in the General Conclusion.— I am unable to concur in some of the conclusions drawn from

the evidence by Chief Justice Stewart. The evidence does not show that the appellant knew who the parties were that were dogging and running his lambs and ewes. That fact was reported to him, and having two bands of lambs and ewes in that vicinity, he did not want the bands mixed, and took three of his men and went immediately to find the sheep. He did not know at that time who had been dogging and running his sheep, and the evidence does not show that he knew where the complaining witness was until said witness called to him when he was from 100 to 300 yards away and going in another direction. The complaining witness called to him and told him he wanted to see him, and he then turned and rode down in the vicinity of the complaining witness, and before he got to him the complaining witness left the fence that he was fixing and with a hammer in his hand went across a ditch some thirty or forty feet to meet the defendant. The evidence shows that at that time defendant was on his horse and in the highway. The complaining witness continued to advance toward the defendant until he arrived to within about ten feet of him, and defendant knowing the fighting reputation of the complaining witness, according to his testimony, threw his gun on him and told him to stop and not to come nearer. The complaining witness himself testified as follows: "I was about ten feet from the defendant about the time he had his gun in his hand and on horseback, pointed at me. . . . . I called the defendant because I wanted to talk to him; I was at the fence when I called, and then when he came toward me I stepped out towards the road over from the fence. I stepped across that ditch—it is a little ravine, it has no ditch to it—it is just a little ravine, and I stepped across it. I had the hammer in my hand; I held the hammer the same as any man would hold a hammer, in my hand, right by the handle. I came toward the defendant. . . . . The defendant at that time was right at the road. I came right across the road; he probably came a foot or two across the road." This is a part of the testimony of the complaining witness, and it shows that he had called the defendant and then proceeded with his hammer in his hand toward the defendant to

within about ten feet of him, and then the defendant threw his gun down on him and told him not to come nearer.

A witness on behalf of the state by the name of Thompson testified, among other things, as follows: ''Percy [the complaining witness] was standing there when the defendant was holding his gun on him. They were talking back and forth.' I said they were rather abusing each other . . . . and the defendant was holding him back with a gun.'' Why holding him back with his gun? Because he was advancing on him. The evidence shows that the reputation of Percy was bad for peace and quiet; that he appeared to be of a fighting disposition, and having called the defendant down to where he was and proceeded toward him with a hammer in his hand to within ten feet of defendant before he threw his gun down on him, indicates, to my mind, that the defendant did only what any prudent man would do to protect himself under the facts and circumstances shown by the evidence. According to Percy's own testimony, the defendant was not more than a foot or two out of the main traveled road, on his horse, and Percy was advancing on him with his hammer and had arrived within ten feet before the defendant made any demonstration toward him whatever. And Thompson, a disinterested witness on behalf of the state, testified that they (defendant and complaining witness) stood there talking back and forth with the defendant holding the complaining witness off with a gun. It must have appeared to that witness that the complaining witness was desirous of getting nearer than ten feet to defendant, else there would have been no necessity of holding him off with his gun. He certainly could have talked to defendant at a distance of ten feet.

The chief justice states in his opinion that the only conclusion that the prosecuting witness or the jury could arrive at was that the defendant was looking for trouble. I do not think any such conclusion can reasonably be drawn from the evidence. The defendant knew the character of the complaining witness, and he knew if he let him approach nearer than ten feet with a hammer in his hand he might knock him off his horse before he could get out of his reach, or before he could

level his gun on him. In my view of the evidence, it does not matter whether the gun was loaded or not, for the defendant would have a right in self-defense to stop the complaining witness from coming nearer than ten feet by drawing his gun on him if he were coming to him with a hammer in his hand. In this case I think it is a violent presumption that the gun was loaded in the face of the positive testimony of the defendant that it was not loaded but that he used it as he did to prevent the defendant from coming any nearer to him.

It is surprising to me, from all the evidence contained in the record, that the jury should find the defendant guilty. The jury must have concluded that the complaining witnesses and other witnesses for the state, as well as the witnesses for the defense, did not testify to the truth, as the evidence shows that the complaining witness advanced within ten feet of the defendant and that defendant was holding him off with his gun, thus preventing him from coming within striking distance with the hammer.

However, since the question was presented to the jury whether the defendant acted in self-defense in repelling a threatened injury, and they found against him on that point and recommended him to the mercy of the court, I am inclined to concur, and do concur, in affirming the judgment.

Ailshie, J., concurs.

Petition for rehearing denied.