(No. 5513. December 20, 1930.)

STATE, Respondent, v. CLEO BUSH, Appellant.

[295 Pac. 432.]

W. L. Dunn and Peterson, Baum & Clark, for Appellant.

W. D. Gillis, Attorney General, and Fred J. Babcock, Assistant Attorney General, for Respondent.

VARIAN, J.—Appellant was convicted of the crime of assault with a deadly weapon under C. S., sec. 8252, and appeals from the judgment and an order denying his motion for a new trial.

The defendant, his brother William V. Bush, Anna Bush, said brother's wife, and Cecilia Drexler, her sister, all living at Twin Falls, on the night of May 10, 1928, attended a dance at the Filer dance-hall. Shortly after their arrival, William V. Bush and a man named Marvin Cole went downstairs from the smoking-room at the dance-hall and engaged in a rough-and-tumble fist fight. The defendant held the fighters' coats. After a time defendant attempted to interfere by kicking at the combatants, who were down in the street struggling. The prosecuting witness, George Jasper (who is related to the defendant and his brother by marriage), interfered, telling defendant to "let them settle it

their own way.'' The fighters then got up and fought each other across the street, when they again went down. Thereupon, defendant attempted to kick Cole and struck his brother William in the face. Then Jasper intervened and he and defendant began a fist fight on their own account. Jasper testified that the first blow he received was on the left side on the ribs, from which he felt a ''stinging pain.'' Finally, defendant backed away and pointed an automatic pistol at Jasper, used obscene words, and said, ''Now, will this stop you?'' and he answered, ''Yes, it will.'' In the meantime, William V. Bush and Cole had ceased fighting, and the former rushed between defendant and Jasper, saying, ''Don't shoot, Slim; this is George.'' Jasper also testified that defendant rushed at him and said, ''Get away, Bill, and leave me at him; I'll kill him.'' Jasper dodged behind a car and went back to the dance-hall, arriving in time for the last dance. He had felt his side paining him more or less, and discovered, when he stepped on the running-board of his car to go home, that when his shirt and underwear pulled away from his body, it felt wet and sticky. He then went to a doctor's office, where it was discovered that Jasper had a ''stab wound'' in the chest about an inch long, running transverse to the line of the ribs. It was directly over a rib and was a quarter of an inch in depth. The doctor testified that the sharp instrument used to inflict the wound could not be determined, nor whether or not it was a deadly weapon. We will refer to parts of the testimony in greater detail in discussing the points involved.

■■ An information charging defendant with assault with a deadly weapon was filed September 10, 1928, a demurrer to which was sustained and the prosecuting attorney directed to file a new information. On September 12, 1928, a new information was filed, charging:

''The said Cleo Bush, on or about the 10th day of May, 1928, in the county of Twin Falls, state of Idaho, did then and there willfully, wrongfully, unlawfully, feloniously, and intentionally make an assault, with two certain deadly weapons, to wit: with a pistol, which said pistol was then and

there likely to produce great bodily injury, and with a sharp instrument, the exact nature of which is at this time unknown to this affiant, and which said sharp instrument was then and there likely to produce great bodily injury, upon the person of one George Jasper, then and there a human being, by then and there attempting with the intention to do great bodily injury to the person of said George Jasper, he, the said Cleo Bush, then and there having the present ability to do so; and which said assault was then and there likely to produce great bodily injury to and upon the person of said George Jasper," etc.

Defendant demurred to this information for that it failed to state a public offense, alleged an assault with two deadly weapons, and failed to show in what respect the weapons were deadly or by what means they were likely to produce great bodily injury; that it charged more than one offense; that it does not conform to C. S., secs. 8825, 8826 and 8827, governing informations, in that it does not appear that the assault was committed by pointing a loaded pistol or by striking another with the pistol, or in what manner it was likely to produce great bodily injury, or whether it was intended to charge a single assault with two instruments, or to charge two separate acts, or in what manner the alleged unknown sharp instrument became a deadly weapon, or in what manner or use it was likely to do great bodily injury. The court overruled the demurrer which is assigned as error. Appellant does not argue this assignment.

The information charges substantially in the language of the statute (C. S., sec. 8252) and is sufficient. (*State v. Muguerza,* 46 Ida. 456, 268 Pac. 1; *State v. Gee,* 48 Ida. 688, 284 Pac. 845; *State v. Brooks,* 49 Ida. 404, 288 Pac. 894.) It was not necessary to allege that the pistol was loaded; that is a matter relating to the proof only. (*State v. Muguerza, supra.*) The information stated but a single offense and is not vulnerable to the attack made.

Appellant contends that the evidence entirely fails to show that the assault was made with a deadly weapon. As to the use of a sharp instrument, the only evidence of its

nature is to be deduced from the location and size of the wound and the holes in the clothing worn by the prosecuting witness during the fight. It does not appear whether the sharp instrument employed was a deadly weapon, and there is no direct testimony that defendant struck Jasper with anything other than his bare fist.

As to assault by pointing a pistol: To constitute the crime charged, the state must also show that the pistol was loaded at the time it was pointed. (*State v. Yturaspe,* 22 Ida. 360, 125 Pac. 802.) Appellant contends that the undisputed evidence is that it was not loaded, Four persons left William V. Bush's home to dine at the Perrine Café on the night of the fracas. After dinner they returned to the Bush home to enable the two ladies to change their dresses, after which they drove in a taxi to Filer. Defendant testified that before he left his brother's home to go to the café, he "saw them" place an automatic in Mrs. Bush's purse. While he was fighting with George Jasper, Mrs. Bush ran to defendant, who said to her, "Give me that." She held the open purse up, and defendant drew out the automatic pistol from it. It was not loaded because before going to supper he saw his brother William examine it and Mrs. Bush put it in her purse. Defendant did not examine the pistol.

William V. Bush testified that the gun belonged to him; that it was in the dresser drawer at home "until we started to Filer, and my wife put it in my sister-in-law's pocketbook; it was not loaded"; that the reason the gun was taken away with them was because the locks on their house were insecure, and they generally carried their rings and other small valuables including this pistol, when they went out for the evening; he looked at the gun that night before they left for Filer; it was empty and he had had no clips or ammunition for it at the house for a year; danced three or four dances before he and Cole met that night; his sister-in-law carried the purse containing the gun to Filer.

Mrs. Bush testified that she gave the gun to defendant, and it was not loaded; that witness and her party got to

Filer about 10 o'clock that evening and the fights occurred a little after eleven; when defendant was fighting, she carried her sister's pocketbook; the reason she gave defendant the gun was because she thought one Giffen was going to "jump on" him; brought the gun because she feared someone would steal it from the house; the gun was not loaded when she left the house; neither she nor her husband loaded it shortly before the fight at Filer.

The evidence is far from being conclusive that the automatic pistol was empty when it was pointed. Miss Drexler, who carried it from Twin Falls to Filer, might have loaded it, and she was not examined about the pistol. The defendant is not clear as to how he knew the pistol was not loaded, and admits he did not examine it. The acts of all the parties, under the circumstances surrounding them at the time, were sufficient to justify the jury in finding the pistol was loaded. (*State v. Yturaspe, supra; People v. Dodini,* 51 Cal. App. 179, 196 Pac. 510; *People v. Hall,* 87 Cal. App. 634, 262 Pac. 50; *People v. Seaman,* 101 Cal. App. 302, 281 Pac. 660; *Jackson v. United States,* 102 Fed. 473 (485), 42 C. C. A. 452.)

The admission of certain testimony is assigned as error. The following questions and answers thereto occur in the cross-examination, by the prosecuting attorney, of the witness William V. Bush, brother of defendant:

"Q. Is it not a fact that you made remarks before you left Twin Falls that you were going out there to clean up—

"Mr. Dunn: Just a minute. I object to that as incompetent, irrelevant, and immaterial, and not proper cross-examination.

"The Court: No, I think he may answer.

"A. No, sir.

"Q. Earlier in the evening, at your home, did you not have as a dinner quest a brother of Mr. Jasper?

"A. I did not; he was no dinner guest there; he was there; but he was no dinner guest.

"Q. He was there?

"A. Yes, sir.

"Q. And did you not tell him at that time that you and Slim (defendant) were going out to Filer to the dance and clean up on the bunch?

"A. I did not; no, sir.

"Mr. Dunn: I object to that as incompetent, irrelevant, and immaterial, not proper cross-examination, and in no way connected with the issues in this case.

"The Court: No, I think the answer may stand.

"Q. And did you not, on that occasion, point to a bag or suitcase and say, 'When we go we will go heeled,' or words to that effect?

"A. I did not; no, sir.

"Q. And did you not tell him on that occasion that 'In that bag we have two automatics and two blackjacks,' or words to that effect?

"Mr. Dunn: Just a moment, if the court please. I want to make the same objection to all of this testimony.

"The Court: No, he may answer.

"A. I did not say we had two blackjacks and two automatics.

"Q. Did you say anything to him about going to Filer?

"A. No, sir, for we didn't know we were going at that time."

Again, the record of the cross-examination of this same witness shows:

"Q. Now, Mr. Bush, do you know of one Gerald Hunt?

"A. I do not.

"Q. Jerry Hunt?

"A. I know a Jerry Hunt, the barber down here.

"Q. Do you know a Jerry Hunt from Kimberly?

"A. I do not.

"Q. Mr. Bush, do you remember of going up to a car parked near where this fracas occurred, in company with your wife, immediately after the fight, and making this statement to the occupant of that car, in effect, that 'If they had not stopped us, somebody would have got theirs,' and then calling to your wife, Mrs. Bush, and saying to her, 'Come here and show the folks what we got,' and that there-

upon your wife came to the car and opened her purse and you reached in the purse and took out an automatic pistol? I will ask you whether or not that occurred.

"Mr. Dunn: Just a minute. Now, may it please the court, I object to that as immaterial, incompetent, and irrelevant; not proper cross-examination, and further, that if it was after the fight it is highly immaterial; and further, that if it was for the purpose of impeachment, no proper foundation has been laid; the time has not been fixed, and the persons present have not been named.

"The Court: I think he may answer."

The witness answered, after some further colloquy:

"A. I was called over to a car and was offered a drink, which I accepted. I took a drink.

"Q. Was that all that happened?

"A. They made some remark to me about—I couldn't— I don't remember exactly what it was about—they said something, and then my wife walked up, and I said, 'I guess they stopped when they saw this.'

"Q. That is what was said?

"A. Yes, sir, that is what I said.

"Q. And you did take the pistol out of the purse?

"A. I picked up the gun."

Mrs. William V. Bush was interrogated on cross-examination as to the contents of her purse, when the following occurred:

"Q. Did you have any cartridges?

"A. No, sir.

"Q. Where did you have those?"

The last question was objected to as not proper cross-examination, since the witness had not testified to having any cartridges. The question was improper.

The witness denied the statements attributed to him, and in no instance referred to did the prosecuting attorney call the person to whom the alleged statements were made, in rebuttal. In most instances except the last, the form of the questions did not indicate they were asked as for im-

peachment, and we think the objection that they were incompetent, irrelevant, and immaterial sufficient to preserve defendant's rights on appeal. (*People v. Morrison,* 194 N. Y. 175, 128 Am. St. 552, 86 N. E. 1120 (rehearing denied, 195 N. Y. 116, 133 Am. St. 780, 16 Ann. Cas. 871, 88 N. E. 21.)

 Questions as to prior statements inconsistent with the witness' testimony could be asked for the purpose of impeachment. C. S., secs. 8038 and 8039, govern the right of impeachment of witnesses in trials in this state. They read:

C. S., sec. 8038: "A witness may be impeached by the party against whom he was called, by contradictory evidence, or by evidence that his general reputation for truth, honesty, or integrity is bad, but not by evidence of particular wrongful acts, except that it may be shown by the examination of the witness, or the record of the judgment, that he had been convicted of a felony."

C. S., sec. 8039: "A witness may also be impeached by evidence that he has made, at other times, statements inconsistent with his present testimony; but before this can be done, the statements must be related to him, with the circumstances of times, places and persons present, and he must be asked whether he made such statements, and if so, allowed to explain them. If the statements be in writing, they must be shown to the witness before any question is put to him concerning them."

 These sections provide how a witness may be impeached but he cannot be impeached upon any material matter. (*State v. Farmer,* 34 Ida. 370 (373), 201 Pac. 33.) And the requirements of C. S., sec. 8039, must be complied with before an impeaching question may be asked. (*State v. Brassfield,* 40 Ida. 203 (209), 232 Pac. 1.)

 "A witness is not allowed to testify as to an unsworn statement made by himself on a former occasion, and declarations of a witness out of court inconsistent with his testimony are not admissible to prove the truth of the facts stated, but only for purposes of impeachment." (22 C. J., p. 206.)

See, also, 40 Cyc., p. 2764; *Portland Cattle Loan Co. v. Gemmell,* 41 Ida. 756 (766), 242 Pac. 798; *People v. Davenport,* 13 Cal. App. 632, 110 Pac. 318.

It has likewise been held that if the inconsistency only appears from inference, and another inference may be drawn in favor of their consistency, then the second statement, as here, is not admissible for impeachment. (*People v. Collum,* 122 Cal. 186, 54 Pac. 589. See, also, *State v. Edwards,* 106 Or. 58, 210 Pac. 1079.) The only inconsistency between the testimony of the witnesses, neither of whom was the defendant, to the effect that the gun was not loaded, and the former statements of the witness William V. Bush, ''When we go we will go heeled,'' ''Clean up on the bunch,'' exhibiting a pistol after the fight and saying, ''If they had not stopped us, somebody would have got theirs,'' etc., is based upon the inference that the language used refers to loaded pistols, which inference does not preclude the inference that the pistol, in every instance mentioned, was not loaded.

There is no charge of conspiracy here, and when it is considered that the state was required to prove the pistol was loaded at the time it was pointed at Jasper, this evidence was peculiarly prejudicial to the defendant, as tending to show a purpose on the part of his companions of going to the dance with a design to resort to violence. The questions were improper, and bring the case well within the rule laid down in *State v. Irwin,* 9 Ida. 35 (44), 71 Pac. 608, 611, 60 L. R. A. 716:

''It is the duty of the prosecutor to see that a defendant has a fair trial, and that nothing but competent evidence is submitted to the jury, and above all things he should guard against anything that would prejudice the minds of the jurors, and tend to hinder them from considering only the evidence introduced.''

See *State v. Fowler,* 13 Ida. 317 (323), 89 Pac. 757; *State v. Rogers,* 30 Ida. 259, 163 Pac. 912.

The evidence of the pistol's being loaded was purely circumstantial, and the testimony erroneously admitted

might be said to have been the determining factor with the jury in reaching their verdict, and therefore it should not be permitted to stand. (*State v. Douglass*, 35 Ida. 140 (151), 208 Pac. 236.)

■■■ Appellant assigns as error the admission of the sweater jacket, shirt, and undershirt worn by Jasper, the prosecuting witness, on the evening of the affray, as being greatly prejudicial to the defendant. This court has accepted the rule that "Articles of clothing worn at the time of the crime by the person injured or killed are admissible in evidence, provided they illustrate or throw light on some issue, and provided they are properly identified and are shown to be in substantially the same condition as at the time of the offense." (16 C. J., p. 619, sec. 1226e.)

See *State v. Dong Sing*, 35 Ida. 616 (622), 208 Pac. 860; *State v. Breyer*, 40 Ida. 324 (332), 232 Pac. 560.

The exhibits were clearly admissible as throwing some light upon the nature of the instrument used in making the wound, were properly identified, and shown to be in substantially the same condition as at the time of the offense.

Other assignments of error as to the admission of evidence have been examined and deemed not well taken.

Instruction No. 9 refers to the wound on the chest of the prosecuting witness as being "inflicted by the defendant on the person of the said George Jasper." It is evident that this is an inadvertence, which should be remedied if the case is tried again.

■■■ Appellant complains of the italicized portion of instruction No. 13 given by the court, reading as follows:

"The court instructs the jury that a bare fear of being killed or of receiving great bodily harm is not sufficient to justify an assault with a deadly weapon. *It must appear that the circumstances were sufficient to excite the fear of a reasonable person,* similarly situated, acting in good faith and viewing the situation and circumstances from his standpoint. . . . . "

His contention is that the circumstances need only be sufficient to excite the defendant's fear, not that of a rea-

sonable person. The instruction closely follows the language of the statute on justifiable homicide, and was properly phrased. (C. S., secs. 8219, 8220; *State v. Fleming,* 17 Ida. 471 (484), 106 Pac. 305.) We find no error in this instruction.

The assignments of error relative to the admission of evidence tending to show that defendant fled from the state shortly after the affray, are not well taken.

For the reasons stated, the judgment and order are reversed and the cause remanded, with directions to grant a new trial.

Lee and McNaughton, JJ., concur.

GIVENS, C. J., Dissenting.—I concur excepting as to the reasons given for the reversal, as I think the evidence held prejudicial was admissible (40 Cyc., p. 2486), and therefore think that the judgment should be affirmed.

Budge, J., dissents.