Roy HUTCHINSON, Plaintiff in Error,

v.

STATE of Oklahoma, Defendant in Error.

No. A–12000.

Criminal Court of Appeals of Oklahoma.

Sept. 8, 1954.

Harry C. Kirkendall, Enid, Leon C. Phillips, Okemah, for plaintiff in error.

. Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

JONES, Judge.

The defendant, Roy Hutchinson, was charged by an information filed in the District Court of Garfield County with the crime of assault with a dangerous weapon, was tried and found guilty by verdict of the jury which being unable to agree upon the punishment, left the punishment to be fixed by the court. Thereafter the accused was sentenced to serve three years in the penitentiary and has appealed. .

The following assignments of error are presented:

1. The court erred in refusing a continuance.

2. The court erred in refusing a new trial on the ground of newly discovered evidence.

3. The judgment and sentence is not supported by the evidence and is contrary to law.

4. The County Attorney was guilty of misconduct in his examination of the witnesses.

To arrive at a proper understanding of the issues, it is necessary to give more than the usual short summary of evidence. It appears undisputed that about 7:00 o'clock on Sunday evening of January 21, 1951, one John Waldman was struck on the head and back several times by a car crank near the community of Billville in Garfield County about 12 miles from Enid and that as a result of said injuries, he was confined to the hospital for two days. The defense was in the nature of an alibi, the defendant and his witnesses testifying that defendant during all of the afternoon of the day of the alleged assault and up until 11:00 o'clock that night, was at the Okie Joe Cafe in Enid taking care of his five year old child while his wife was performing her duty as a waitress in said cafe. The chief points of conflict in the testimony seem to center around the automobile allegedly driven by the assailant which the prosecuting witness positively swore was a Mercury while the defendant and his witnesses positively swore that defendant only owned a 1936 Ford coupe. The prosecuting witness also stated that his assailant held the crank in his right hand and beat him with it while the defendant showed his right hand to the jury and the record discloses that it was a withered hand and according to defendant's contention he was unable to so much as lift a car crank with it.

John Waldman, the prosecuting witness, was a naturalized citizen, 61 years of age, who had come from Austria Hungary in 1909. He testified that at one time he had rented a house in Enid to a sister of defendant and that he had become acquainted with defendant while he was at the sister's home; that on the Sunday afternoon in question, he, together with Clarence Benson and Jimmie Curran, went to the Chuck Wagon Cafe in Enid about 2:00 o'clock and commenced to drink beer; that during the afternoon he consumed about 7 bottles of beer; that the defendant joined the party in the middle of the afternoon and drank beer with them until about 6:00 o'clock. At that time defendant suggested that Waldman accompany him to his sister's house because "she wanted a date with Waldman." Waldman had heard defendant attempting to sell Mrs. Rich a Mercury automobile and defendant was driving a Mercury at the time in question. That Waldman left the cafe in a Mercury car with defendant and proceeded on the highway about 12 miles east of Enid near Billville. That Waldman complained that he did not know the sister lived so far from town and defendant said, "If you don't like what I am doing, we will go back," and proceeded to turn his automobile around and start back toward Enid. That he had just driven a short way when defendant pulled off the road and demanded Waldman's pocketbook and struck him a blow on the side of the head; that defendant reached back into the rear seat of the car with his right hand and picked up a car crank; that witness got out of the car and defendant came around the rear of the car with the crank in his hand and struck Waldman several blows on the head and back and took his billfold and removed

some money from it. That he had about $300 in his billfold when he went to the cafe that afternoon but that he had paid for the various drinks which had been consumed. That after defendant had struck several blows and left him on the side of the road, defendant drove off in his automobile while Waldman staggered to the closest house and had the Oldhams call the officers and an ambulance.

Clarence Benson testified that he had known Waldman for 30 years and that they both roomed at the Highway Rooms. That he did not know defendant but he identified defendant as being the man who came to the Chuck Wagon Cafe while he, Waldman and Curran were drinking beer and sat down and drank beer with them until about 6:00 o'clock when defendant and Waldman left the cafe together.

Knowland Rich testified that he and his wife operated the Chuck Wagon Cafe. He remembered the day that Waldman was assaulted. On that afternoon he saw Waldman, Benson and Curran in his cafe drinking beer. He did not know defendant but some stranger came in and joined them in drinking beer; that he did not pay particular attention to them and that they left the cafe about 6:00 o'clock. The witness did not identify defendant as being the stranger who came into the cafe and drank beer with Waldman or left with him.

Ivy Applebee testified that on January 21, 1951, he and his wife operated the Okie Joe Cafe in Enid; that defendant's wife worked there as a waitress from 12:00 o'clock noon until 11:00 at night. That on the day of the alleged assault, defendant, his wife and baby came to the cafe at noon and remained there until the witness left to go home at 1:00 o'clock. That he returned to the cafe at 11:00 p. m. and defendant and his wife and child were just leaving the cafe when he returned. On cross-examination he testified that less than a week before January 21st, he borrowed defendant's car and drove it to Ponca City; that the car he borrowed was a 1936 model Ford coupe; that the car had to be cranked or pushed to start; that he looked in the car for a crank and could not find any and had to be pushed.

Mrs. Stella Applebee testified to substantially the same facts as her husband. She further testified that she returned to work at 9:00 p. m. on January 21st and defendant was there when she returned and remained in the cafe all of the time until he, his wife and child left at 11:00 o'clock; that Mrs. Hutchinson did not come back to work the next day and she did not know that she did not intend to return until a sister of defendant called her and said that Mrs. Hutchinson was going home. Mrs. Hutchinson had drawn her pay for the week the middle of the week and at the time she left there was only a balance of 24 cents owing to her.

Mr. and Mrs. W. L. Oldham testified they owned a filling station at Billville. That shortly after 7:00 o'clock on January 21, 1951, Waldman, who was a stranger to them, came to their door and said, "Help me, they have been beating me up." He further stated, "They had beat him up and robbed him." They looked in his billfold for identification and found about $150 or $180 in it. They called the officers and the ambulance. The next day Mrs. Oldham walked to the place where the alleged assault occurred and found an instrument which was described as a car crank which she later delivered to the sheriff. This instrument was identified and admitted in evidence and it appeared undisputed that it would not fit a Ford automobile such as allegedly possessed by the defendant on the date in question.

Two highway patrolmen testified that they received a telephone call about 9:30 or 10:00 o'clock p. m. and went to Billville and found Mr. Waldman who had been injured and remained with him until the ambulance arrived to take him to the hospital. Here the State rested its case.

The first witness for defendant was Mrs. Rich who together with her husband, Knowland Rich, operated the Chuck Wagon Cafe. She knew Waldman, Benson and Curran. They came into her cafe on the day in question about 2:00 o'clock and she served them food and beer. They stayed in there most of the afternoon. About two days before that time a man had come to her cafe wanting to sell her a 1941 Mer-

cury automobile. He was dark complexioned, had real dark curly hair and wore a large plaid wool jacket. He was not the defendant. She testified that this same man who tried to sell her the Mercury car came in on Sunday afternoon, January 21st, sat down at the table and drank beer with Waldman and the others, and defendant was definitely not that man. She said Hutchinson had never at any time talked to her about selling an automobile.

Mrs. Hazel Weir was the cook at Okie Joe's Cafe where Mrs. Hutchinson worked. She testified that defendant was at the cafe constantly from noon until 11:00 that night taking care of the baby; that the witness left the cafe with the defendant and his wife at 11:00 p. m. in defendant's car; that they had to push the car to start it; that Mrs. Hutchinson told her that she would not be at the cafe the next day as she was going home the following day.

Mrs. Florence James worked at Okie Joe's Cafe on January 21st. She testified that when she went to work at 5:00 p. m., defendant was sitting at a stool at the counter; that when she left the cafe at 9:00 p. m., he was still there taking care of the baby.

Mrs. Roy Hutchinson, wife of defendant, testified that defendant remained at Okie Joe's Cafe from noon until she quit work at 11:00 o'clock that night taking care of their five year old son. That he remained in the cafe all of the time either visiting with his friends or playing the marble machine or music box and taking care of their son. That when they left the cafe about 11:00 that night they returned to their rooming house and spent the night; that the next morning about 10:00 a. m. they drove to defendant's parents' in Cushing, Oklahoma, where they spent the night; then they drove to Oklahoma City and stayed about three days; then to Amarillo, Texas, and from there to California. That her husband was looking for work and worked part time at various places; that he owned a 1936 Ford coupe; that they had to push the car to start it and never did have a crank in the car to assist in starting it. That he had never owned a

Mercury automobile and she had never seen him driving a Mercury.

Roy Hutchinson testified that he was not at the Chuck Wagon Cafe on the afternoon of January 21st, but spent the whole afternoon at Okie Joe's Cafe taking care of his baby son; that he had never had a conversation with Waldman in his life, but knew him because he had seen Waldman talking to his brother-in-law when defendant was visiting his sister in the latter part of 1950. He specifically denied getting into a car with Waldman or trying to arrange a date between Waldman and his sister, and stated that his sister and her husband had been living together for 16 years and had never been separated, but were happily married. He testified that at the time of the alleged occurrence he owned a 1936 model Ford coupe and had never owned a Mercury car in his life; that while he was in California he sold his '36 model Ford at Bakersfield for $140. That on Monday morning after the alleged assault on Sunday night, he and his wife drove to Cushing and to the various other places as related by his wife. That he did not know that Waldman had been assaulted and was not trying to hide or run from anyone and did not know a charge was filed against him until officers arrested him in California the latter part of April. That he waived extradition and voluntarily returned to Oklahoma with the officers; that after he had made bond and was freed from jail, he was talking to Waldman in front of the Cherokee Theater and Waldman commenced to tell him about the trouble he had with a fellow that had been brought back from California, and that Waldman didn't even know that he was talking to the man that he claimed had assaulted him. Defendant exhibited his right hand to the jury and stated that it had been withered since 1938 following an accident and that he had no strength in the hand with the exception of the forefinger and the thumb and could not possibly lift a car crank with the hand. In the cross-examination of this witness many questions were asked which are made the basis for the fourth assignment of error and

they will be set forth at length in discussing that proposition.

In rebuttal Sheriff Lelon Coyle was called as a witness and while he was testifying an attempt was made to get the contents of a Federal Bureau of Investigation record before the jury and the fourth assignment of error is also directed at this alleged misconduct of the prosecutor.

As to the first assignment of error, the record discloses that both sides announced ready for trial at the commencement of the trial. The motion for continuance was dictated into the record by counsel for the accused after the State had rested its case. A continuance was sought on account of the absence of the witness Curran who allegedly was in the Chuck Wagon Cafe drinking beer with the prosecuting witness on the afternoon of January 21st. Counsel stated in his oral motion that he was informed that the witness was in the hospital in Oklahoma City.

The motion was not timely presented. Phillips v. State, 71 Okl.Cr. 287, 111 P.2d 203, 22 O.S.1951 § 584. Neither was the motion supported by affidavit and it was insufficient on its face to make a prima facie showing entitling the accused to a continuance. Although the witness was subpoenaed by both the State and defendant, counsel for the accused announced ready for trial and made no request for an attachment to procure the attendance of the witness.

The motion for a new trial on the ground of newly discovered evidence evidently refers to the absent witness Curran, but in the motion for a new trial he is referred to as James Kerns and it is alleged that the defendant had learned subsequent to the trial that James Kerns would testify that Roy Hutchinson was not present and did not appear at the Chuck Wagon Cafe during the afternoon of January 21st while he, Waldman and Benson were drinking beer. The motion further alleges that subsequent to the trial a petition was filed in the County Court of Garfield County alleging that John Waldman was mentally incompetent and that examining physicians appointed by the court stated that he was suffering from hallucinations; the motion further alleged that one Dennis Vinson who testified that defendant was in the Chuck Wagon Cafe was committed to the hospital for mentally sick persons at Supply on October 8, 1952, subsequent to the trial. (No Vinson testified for the State; Clarence Benson did testify and we do not know whether this motion has reference to Benson or not.)

The motion for new trial on the ground of newly discovered evidence was verified by the defendant but no evidence was introduced at the hearing on the motion which would tend to prove the alleged facts stated in the motion. Under the statute, before a trial court would be justified in granting a new trial on the ground of newly discovered evidence, it is provided that the defendant must produce his witnesses and take their testimony at the hearing on the motion or produce affidavits of witnesses which affidavits would show the facts to which the alleged witnesses would testify. 22 O.S.1951 § 952. No compliance was had of either of these essential requirements. Neither did the defendant make any showing that the alleged new evidence could not with reasonable diligence have been discovered before the trial.

As to the contention in the third assignment of error that the judgment and sentence is not supported by the evidence, we feel that it cannot be sustained. We might have arrived at a different verdict than that rendered by the jury if as individual citizens we had been sitting on the jury, but the witness Waldman positively identified defendant as his assailant. He was in part corroborated by Clarence Benson. No other witness attempted to connect the accused with this alleged offense. The strongest circumstance against the accused is his flight shortly after the alleged offense was committed. He left Enid early the following morning and was not apprehended until three and one-half months later in California. Defendant attempted to make an explanation of his alleged flight, but the testimony of defendant and his wife on this point seems to us to be very weak and

not substantial. If it had not been for this one fact in the case, we would be so definitely impressed by the strength of defendant's position that we would have hesitated to have placed our stamp of approval on the judgment and sentence which was rendered. The witness Mrs. Rich almost completely destroyed the State's case. She said defendant was definitely not the man who attempted to sell her the Mercury automobile and Waldman himself positively identified the Mercury salesman as being his assailant. The proof is overwhelming that defendant owned only an old 1936 model Ford coupe and so far as the record shows, with the exception of the lone witness, Waldman, no one had ever seen defendant in a Mercury car. However, these are matters which go to the weight which the jury might attach to the testimony of Waldman and we feel that the evidence of the State was sufficient to require submission of the case to the jury.

This brings us to the fourth assignment of error, to-wit, the alleged misconduct of the prosecuting attorney in his examination of the witnesses. Attention is first directed to the cross-examination of Mrs. Rich. In considering her cross-examination, it should be borne in mind that her husband refused to identify defendant as being the stranger who came in and sat down and drank beer with Waldman in the Chuck Wagon Cafe. The record reveals the following:

"Q. Now if your husband testified that he was in there, which one of you is mistaken?

"By Mr. Kirkendall: Now wait a minute, you are assuming a fact not in evidence.

"By Mr. Armstrong: Mr. Rich so testified.

"By Mr. Kirkendall: Just submit the record.

"By the Court: Well, the jury heard the evidence; they heard the gentleman testify,—they heard all of the evidence.

"* * * * * *

"Q. He wasn't the one that was sitting there with these fellows? A. That is right.

"Q. Well now let me ask you this, Mrs. Rich, if John Waldman, Mr. Benson, Mr. and Mrs. Applebee, and your husband, testified that he was in there, then what do you say?

"By Mr. Kirkendall: Now wait just a minute,—that is an improper question, because those people didn't all testify to that.

"By Mr. Armstrong: They did testify to that.

"By the Court: The Applebees didn't testify to that,—the jury heard the evidence, gentlemen."

As can be observed, these questions of the County Attorney assumed facts not in evidence and were contrary to the evidence. In the second part of the above quoted examination the court stated, "The Applebees didn't testify to that," which might have left an inference with the jury that the other parties named in the question did testify to that.

Next we consider the witness Hazel Weir. This witness supported the alibi of the defendant. On cross-examination the following appears in the record:

"Q. * * * do you know Mr. and Mrs. Applebee? A. Yes, sir, I worked for them.

"Q. You worked for them; do you know Mrs. Rich and Mr. Rich; Mr. and Mrs. Knowland Rich? A. Yes, I know them.

"Q. Now if those people testified that the defendant here was in the Chuck Wagon that afternoon from about two until six o'clock, drinking beer in there with these other boys, if they testified that, what would you say, —they were mistaken, or just telling a story about it?

"By Mr. Kirkendall: Just a minute, we object to this as laying a false premise, and foundation; they didn't testify to that.

"By Mr. Armstrong: I challenge the record,—they did testify to it, every one of them.

"By the Court: Just answer the question.

"By Mr. Armstrong: I didn't get your ruling, your Honor.

"By the Court: I told her she could answer the question.

"By Mr. Armstrong: What do you say about that, if those folks testified that he was in at that Chuck Wagon Cafe, and wasn't over at Oakey Joe's, but was over at this other place with these other boys, what do you say about that?

"By the witness:

"A. I still say he was in the place where I was working.

"Q. Notwithstanding all of these other witnesses, you still say he was over there?

"By Mr. Kirkendall: We object to counsel arguing with the witness.

"By Mr. Armstrong: This is cross examination.

"By the Court: It is cross examination; overruled.

"By Mr. Kirkendall: But she has answered.

"By Mr. Armstrong:

"Q. You still say he was over there?

"By the witness:

"A. Yes, sir."

After excoriating Mrs. Rich while on the witness stand, the prosecutor in his examination of Mrs. Weir includes her as a witness who testified defendant was in the Chuck Wagon Cafe. This whole cross-examination was improper as neither Mr. and Mrs. Applebee nor Mr. and Mrs. Rich ever testified to one syllable that would in any way connect the accused with the crime nor connect him with being in the Chuck Wagon Cafe on the afternoon of the alleged assault. The Applebees testified in support of the defendant's alibi and Mrs. Rich positively stated he was not the man who sat down at the table with Waldman and Benson to drink beer. The trial court should have admonished the County Attorney to desist from such unfair tactics. Instead of sustaining the objection of counsel of defendant, the trial court merely stated, "Just answer the question."

We shall not give in detail the further examination of the witnesses but when the defendant was on the stand the prosecutor started out in this manner, "Notwithstanding all this array of witnesses here that put you in the Chuck Wagon Cafe, the State is just all wet, aren't they?"

"Do you deny the statement of Mr. and Mrs. Applebee that you were in there and they served you beer with John Waldman here?"

"Do you deny the statement of Mr. Rich that he served you and these boys beer?" Answer. "Mr. Rich didn't tell you he served me beer." Question. "He told the jury that." By Mr. Kirkendall. "We object to that and challenge the record on it." By the Court. "The jury heard the evidence."

On cross-examination of defendant's wife the record discloses the following occurred:

"Q. You know Mr. and Mrs. Applebee? A. Yes, sir.

"Q. And you know Mr. Rich? A. Yes.

"Q. Now if I would tell you that those folks testified that Roy Hutchinson was in the Chuck Wagon down here from two or three o'clock until five or six o'clock that evening, then would you say they were wrong about it? A. They would have to be, or else they have got him mixed up with someone else."

The County Attorney is repeating this erroneous statement so often that he evidently came to believe it was a correct quotation of the testimony of the witnesses and it would not be unreasonable to conclude that some of the jury might be misled by these repetitious erroneous statements.

This assignment of error is also directed at the cross-examination of the defendant concerning his alleged arrests.

"Q. Do you sometimes go by the name of Ray Owen Hutchinson, or Ray O. Hutchinson? A. No, sir, I always go by Roy Hutchinson.

"Q. Are you the same Ray O. Hutchinson who enlisted in the United States Army in nineteen hundred and * * * A. No.

"Q. Have you ever been in the military service? A. I never have.

"Q. You have never been in the Army? A. No, sir.

"Q. Or in the Navy? A. No, sir.

"Q. No Military service? A. No, sir.

"Q. Are you the same Ray Owen Hutchinson that in 1941 were arrested in Pawnee, Oklahoma? A. No, sir, I was not arrested in Pawnee, Oklahoma.

"By Mr. Kirkendall: Wait a minute, that is not proper cross examination, and it is not proper direct examination, and we object to it as incompetent, irrelevant and immaterial.

"By the Court: Sustained.

"By Mr. Armstrong: If you would wait until I get through * * *

"By Mr. Kirkendall: Well you have done gone too far,—I waited a long time.

"By Mr. Armstrong: Q. And that you were turned over to the Army on a charge of * * *.

"By Mr. Armstrong:

"Q. Mr. Hutchinson, do you still deny that you have ever been a member of the Armed Forces of the United States?

"By the witness:

"A. That is right.

"Q. In any branch of the Service?

"A. Within no branch of the Service; I tried to get in but was 4-F."

On rebuttal Sheriff Lelon Coyle was called as a witness and the following dialogue occurred:

"By Mr. Armstrong:

"Q. Well you said the F. B. I. arrested him for you, did you have any information from the F. B. I. as to his numbers, and so forth?

"By Mr. Kirkendall: That is objected to as hearsay and incompetent, irrelevant and immaterial.

"By the Court: Overruled.

"* * * * * *

"Q. Do you know what his F. B. I. number is with regard to his, * * * you may refresh your memory from that (hands witness an instrument).

"By Mr. Kirkendall: That is objected to as incompetent, irrelevant and immaterial, and it has been gone into far beyond the examination,—cross-examination, and it would be hearsay.

"By Mr. Armstrong: He said yesterday that his name was Roy O., and * * *

"By the Court: The objection is overruled.

"By Mr. Kirkendall: Exception.

"By the witness:

"A. His F. B. I. number is 4394612; that started, the first time he was fingerprinted, 9th and 10th and 40.—

"By Mr. Kirkendall: Well now wait a minute,—by you or, by the F. B. I.?

"A. Well Harry, I will have to answer it this way, that is about the F. B. I.; once a person has an F. B. I. number, that never changes. If he is arrested when he is sixteen years old and given an F. B. I. number * * *

"By Mr. Kirkendall: All right now, you have answered, and we object to it as incompetent, irrelevant and immaterial and not proper,—it doesn't tend to prove anything in this case, and it is hearsay.

"By the Court: Overruled.

"By Mr. Kirkendall: Exception.

"By the witness:

"A. At that time he was arrested for the War Department in Washington, D. C., Ray Hutchinson,—Ray O. Hutchinson.

"* * * * * *

"By Mr. Armstrong:

"Q. Well regardless of whether it was Ray O., or Roy O., or Ray, or Roy, does that F.B.I. number change at any time during his life?

"By Mr. Kirkendall: That is objected to as hearsay and not within the knowledge of the witness, and not bind-

ing on this defendant; it is improper rebuttal examination.

"By the Court: Sustained."

It is true that no objection was interposed to some of the questions which the prosecutor asked, but objection was made and an exception was saved to most of them. The Attorney General in his brief concedes that the County Attorney acted improperly as to a part of his examination of the witnesses, but insists that such alleged misconduct was not so prejudicial as to warrant a reversal of the case.

In Flynn v. State, 68 Okl.Cr. 72, 96 P. 2d 96, 106, this court held:

"The repeated asking of incompetent questions, which clearly have for their purpose the intimation of something to the jury that is either not true or not capable of being proved, even though true, is wrong."

In the early case of Watson v. State, 7 Okl.Cr. 590, 124 P. 1101, this court stated:

"When the record discloses that counsel for the state, in the prosecution of a person charged with crime, has been guilty of conduct calculated to arouse the prejudice or passion of the jury and prevent the accused from having a fair and impartial trial, a conviction had should be set aside by the trial court, and a new trial awarded.

"The repeated asking of incompetent questions, which clearly have for their purpose the intimation of something to the jury that is either not true or not capable of being proven if true, is wrong, and such conduct of counsel is not cured because the court sustains objections to the questions.

"In jury trials, incalculable harm is often done by counsel in asking known incompetent questions in the hearing of the jury and thereby forcing the adverse party to object to them also in the hearing of the jury, which manifests a fear of the incompetent questions, and gives emphasis to the harmful matter they are supposed to contain."

In Scott v. State, 13 Okl.Cr. 225, 163 P. 553, it was held:

"Improper cross-examination which clearly discloses the purpose of counsel for the state to degrade or to intimidate a defendant who has the stand as a witness, and which is calculated to prejudice the jury and serves no other purpose, constitutes reversible error."

If this were an ordinary case where the evidence of guilt was conclusively established, this assignment of error would probably not have the significance which we now attach to it. But the above résumé of evidence shows that it is not a case where the evidence of guilt is firmly established. If anything, the preponderance of evidence favors the accused. Because of that, any improper examination which might have prejudiced the accused in the eyes of the jury cannot be passed over lightly as harmless error.

Any witness, and this would include the defendant, who takes the witness stand may not be asked on cross-examination as to arrests where there was no conviction. He may be asked concerning previous convictions for the purpose of affecting his credibility as a witness. Hathcox v. State, 94 Okl.Cr. 110, 230 P.2d 927; 12 O.S. 1951 § 381; Hammons v. State, Okl.Cr., 254 P.2d 793. It was improper for the prosecutor to inquire concerning alleged arrests and under the facts of this particular case, it was improper to attempt to bolster the State's case by flourishing before the jury a copy of what the prosecutor referred to as "his F.B.I. record." An inquiry as to any arrests pertained to a collateral matter and when an answer is made by the witness, the questioner is bound by the answer and he may not by way of rebuttal seek to impeach the witness on such collateral matter. Fleetwood v. State, Okl.Cr., 241 P.2d 962; Clark v. State, Okl.Cr., 239 P.2d 797.

There are many things about this case which should be clarified in a new trial. If the defendant is guilty of the crime charged, the County Attorney should be

able to find some witness in Enid who had seen him on the day in question or at about that time driving a Mercury automobile. The witness Curran should ·be produced by one side or the other to give his version of the case. The County Attorney should check the records of the hospital at Yale for verification of the defendant's story that he was injured in an automobile accident long prior to the date of the alleged assault which automobile accident allegedly left him with a withered hand which was so weakened that he could not lift a car crank with it. There are many features of the case which should be clarified so that an appellate court from a reading of the record in case of conviction would have no hesitation in placing its stamp of approval on the judgment of conviction.

For the reasons hereinabove stated, the judgment and sentence of the District Court of Garfield County is reversed and the case is remanded for a new trial.

POWELL, P. J., and BRETT, J., concur.