665 P.2d 703

STATE of Idaho, Plaintiff-Respondent,

v.

Melvin Dean MAJOR, Defendant-Appellant.

No. 13950.

Supreme Court of Idaho.

June 17, 1983.

**6**

Gar Hackney, of Lynn, Scott & Hackney, Boise, for defendant-appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., Neil Tillquist, Deputy Atty. Gen., Boise, for plaintiff-respondent.

BAKES, Justice.

Defendant appellant Melvin Major was convicted of first degree murder and sentenced to a fixed term of life in prison. He appeals both the conviction and the sentence, asserting numerous errors which denied him a fair trial. We find that none of these errors require reversal of defendant's conviction or reduction of his sentence; thus, we affirm the judgment of the trial court.

During December of 1979, the defendant, his wife and two children were living in Nampa. The victim, Tony Mesa, was living approximately three miles away. The defendant and Mesa had known each other about three years. On New Year's Eve, December 31, 1979, the defendant and his wife went to a bar in Nampa. Mesa was at the bar, a place he frequented. Mesa and the defendant played pool and drank beer the rest of the evening, until the closing of the bar. At one point the owner of the bar asked the defendant to remove a large butcher knife from his right back pocket. The defendant left for five minutes, then returned without the knife. The owner also noticed that, when the bar was closing, the defendant indicated to Mesa that he wanted to accompany him, but Mesa told him to come over the next day instead.

After the bar closed, the defendant went to Mesa's house while his wife went to pick up their child. (Both were on foot, as their car was disabled.) From this point on, there are two versions of what happened. The state's witness, Kerry Buell, a neighbor to Mesa, testified that he saw Mesa come home, with a man following about 8 to 10 feet behind. Mesa stopped at his mailbox, but the man, later identified as the defendant, was encouraging him to hurry up and open the door. Mesa went into his house, but left the defendant outside on the walk. Buell testified that the defendant seemed nervous and edgy. Mesa meanwhile was apparently fiddling with some clear plastic baggies on his kitchen table. Buell quit watching for a time, and when he next glanced over, the defendant was in the house with Mesa. Buell saw Mesa fall down (either fell or was pushed). Buell then left, but when he returned all the lights at Mesa's were off.

The defendant's version is different. He testified that Mesa invited him over, they went to his house together (no stop at the mailbox); they sat and chatted while drinking a few beers. The defendant denied waiting out on the porch at all. According to him, a car with two men in it pulled up to Mesa's house, and Mesa went out to talk to them. The defendant then decided to find his wife and go home. He walked out of Mesa's house, said goodby to Mesa, who was still chatting, and left. The defendant could not describe the car or the two men.

On January 2, 1980, the defendant and his wife, after having retrieved their car from a garage, packed as many of their belongings as they could, and left for California, where her parents lived. They left many belongings behind, including children's clothing, toys, food, kitchen utensils, etc. The defendant testified that they left because he was unemployed, his wife was pregnant, and she wanted to be near her family. He claimed they had been planning the move for two weeks. When they left Nampa, some of their rent remained unpaid because, according to the defendant, they could not have gone to California on their existing funds if they had paid their rent. They left January 2, at approximately midnight. The landlord was unaware they were gone until police went to the defendant's residence to find him.

The body of Tony Mesa was found on January 3, 1980, at 9:00 p.m. No one had

seen him since New Year's Eve. His papers had not been picked up since December 31. He had not kept an appointment to eat a turkey dinner and watch football on New Year's Day.

Mesa's body was found in the hallway of his home, with numerous stab wounds. He had been stabbed once in each knee, once in the buttocks, once in the scalp, once in the hand (possibly a defensive wound), twice under the arm, and three times in the chest. Death, however, was caused by numerous slashes to the throat, during which Mesa's left ear was partially severed, and an artery was fully severed.

Evidence gathered at the scene included two bloody towels, numerous strands of hair, cigarette butts, and a crumpled cigarette pack.

The defendant was arrested in California on January 9, and waived extradition to return to Idaho. His car was searched with his consent and police recovered a shirt and a pair of pants, each with a minute spot of blood on them.

Witnesses testified that the defendant owned a single-edged butcher knife, with a wide but tapered 8-inch blade. Witnesses also testified that the defendant had that knife in his possession on the night of the murder. The doctor who performed an autopsy on the victim testified that the knife that inflicted all the wounds was single-edged and tapered.

An FBI agent testified that some of the hairs found on the bloody towel and on the victim's body matched hair of the defendant. (A match is defined as similarity in more than fifteen characteristics; this hair matched defendant's in twenty characteristics.) Testimony also indicated that this hair had been forcefully removed from the head and had not merely fallen out. Another FBI agent testified that the spot on

defendant's pants was human blood, but could not be identified as to type. The spot on defendant's shirt was not identified as human blood.

Defendant was observed, while in custody, smoking the same brand of cigarettes as those found at the scene. He also had a distinct way of smoking those cigarettes, so as to leave only an unusually small butt. The cigarette butts found at the scene were in a similar, unusually small, condition.

Testimony by an undercover narcotics agent, Max McEvers, indicated that the defendant was a heroin user. McEvers drove around with the defendant looking for heroin to buy, and on at least one occasion went to Mesa's house. McEvers also testified that defendant was suffering from withdrawal from heroin on December 31. He testified that defendant seemed to be having some sort of trouble with his supplier, referred to as "his boy," and that defendant stated that "he was bummed out or something, really mad about his—his boy wouldn't come across with the heroin, and if he didn't start coming across with some dope, that he was going to kill him."

■■ Several of the errors alleged by the defendant can be disposed of quickly. First, the defendant alleges error in the failure of the trial court to grant a challenge for cause to a juror. Defendant alleges that, because of the juror's position in the county (county treasurer), she stood in an attorney/client relationship with the county prosecutor, and thus should have been excused for cause. We dealt with a similar situation in *State v. Cypher*, 92 Idaho 159, 438 P.2d 904 (1968), where the juror challenged for cause was a janitor in the prosecutor's office. In that case, in looking at I.C. § 19–2020,[1] which allows for challenges for implied bias, we ruled that the "proscribed relationship [here attor-

---

1. "19–2020. GROUNDS OF CHALLENGE FOR IMPLIED BIAS.—A challenge for implied bias may be taken for all or any of the following causes and for no other:
. . . .
"2. Standing in the relation of guardian and ward, attorney and client, master and servant,

or landlord and tenant, or being a member of the family or boarder or lodger of the defendant, or of the person alleged to be injured by the offense charged or on whose complaint the prosecution was instituted, or in his employment on wages.
. . . .

ney/client relationship] between a prospective juror and an attorney in the case is not a ground for challenge for implied bias. Such relationship must be shown to exist between the juror and accused or the person allegedly injured by the offense charged." *Id.* at 167, 438 P.2d 904. There was no error in the refusal of a challenge for cause in the present case.

▋ The defendant also claims error in the admission of certain testimony. First, he claims he was denied due process and a fair trial by the trial judge's failure to exclude the jury while James Woolery claimed his fifth amendment privilege because of threats of prosecution for perjury. After Woolery was called to the stand he said, "I can't be sworn in, I have been threatened on the grounds of perjury by the prosecuting attorney." Defendant's counsel did not object to this alleged error at trial. There have been cases where a witness, having been called to the stand by the prosecutor, claimed his fifth amendment privilege, and this was held to be reversible error. However, those cases usually involve a situation where the witness was an accomplice of the defendant, this fact was known to the jury, the prosecutor knew the witness would claim his fifth amendment right, and the prosecutor persisted in asking questions concerning the crime with which the defendant was charged. *See, e.g., Robbins v. Small,* 371 F.2d 793 (1st Cir.1967), *cert. denied* 386 U.S. 1033, 87 S.Ct. 1483, 18 L.Ed.2d 594; *United States v. King,* 461 F.2d 53 (8th Cir.1972); *Shockley v. State,* 335 So.2d 659 (Ala.Cr.App.1975), *aff'd* 335 So.2d 663 (Ala.1976); *People v. Giacalone,* 399 Mich. 642, 250 N.W.2d 492 (Mich.1977). *See also,* Annot., Prejudicial effect of prosecution's calling as witness, to extract claim of self-incrimination privilege, one involved in offense with which accused is charged. 86 A.L.R.2d 1443 (1962). Thus, in most of the cases where this was held to be reversible error, there existed both prosecutorial misconduct and prejudice to the defendant. In the present case, defendant has shown neither. The defendant has not shown that the prosecutor called this witness for the purpose of eliciting a prejudicial inference. He also has not shown that the claim of privilege by this witness in any way prejudiced his case. There is no indication in the record that Woolery was any sort of accomplice. There is also no indication in the record of what his testimony would have been. The state did make an offer of proof, outside the presence of the jury, but the only thing apparent from this offer of proof is that there was a possible attempt to influence Woolery not to testify. There is no indication of what connection Woolery had with the crime charged by the prosecutor. Thus, the jury could not have drawn an unfavorable inference from Woolery's fifth amendment claim, because his connection with the case is itself unclear. Woolery's claim of privilege during defendant's trial was not reversible error. *See State v. Chaffin,* 92 Idaho 629, 448 P.2d 243 (1968). We rejected a similar claim of error for similar reasons in *State v. Polson,* 92 Idaho 615, 448 P.2d 229 (1968), *cert. den.,* 395 U.S. 977, 89 S.Ct. 2129, 23 L.Ed.2d 765.

▋ Defendant also claims that the testimony of Max McEvers, an undercover informant, should have been suppressed. He argues that his statements to McEvers were involuntary because they were made under conditions of "stealth, deceit, false pretenses, and entrapment," without the benefit of *Miranda* warnings. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The law is well settled that *Miranda* safeguards attach only after a suspect has been taken into custody. *Miranda* was not intended "to prohibit the voluntary and spontaneous statements of persons who have not been taken into custody, detained in some manner," etc., from being used against them. *State v. Thomas,* 94 Idaho 430, 489 P.2d 1310 (1971).

The United States Supreme Court has considered, and rejected, claims that the use of statements made to undercover informants violates a defendant's fourth, fifth, sixth and fourteenth amendment rights. *Hoffa v. United States,* 385 U.S. 293, 87

S.Ct. 408, 17 L.Ed.2d 374 (1966).[2] Since defendant presented no proof that his statements were involuntary, there was no error in failing to suppress these statements.

■■■ Defendant also asserts that the admission of unresponsive answers from two witnesses denied him a fair trial. During the trial, the defendant's counsel, on cross examination of Deputy Glenn Slocum, asked, "Did you determine why he was there?" Instead of answering yes or no, the deputy answered, "She told us that he was there purchasing narcotics." A non-responsive answer to such a question often poses a special problem for an attorney. The proper procedure for an attorney to follow in such a situation is to object after the answer, ask that it be stricken from the record, and that the jury be instructed to disregard it. *State v. O'Bryan,* 96 Idaho 548, 531 P.2d 1193 (1975). That is exactly what occurred here. Defendant's attorney objected to the unresponsive answer, and it was stricken from the record and the jury instructed to disregard it. There is nothing to suggest that the defendant was prejudiced or denied a fair trial.

■■■ The second statement that defendant complains of as unresponsive is one made by Max McEvers. While relating the statements defendant made concerning "his boy," McEvers mentioned "Tony," in reference to the "boy." That statement was not unresponsive, and additionally no objection was made by defense counsel. It is well settled that errors not objected to at trial will not be considered on appeal. *State v. Garcia,* 100 Idaho 108, 594 P.2d 146 (1979).[3]

■■■ Defendant also claims he was denied a fair trial by several incidents of prosecutorial misconduct. First, he claims the prosecutor overstepped the bounds of proper cross examination by asking questions that assumed facts not proven. We have examined the record, and it appears that the prosecutor was attempting to establish a possible scenario of occurrences at the murder scene by asking the defendant if that was what really happened. All of the prosecutor's questions were based on possible inferences which might be drawn from facts already in evidence. We find no error in that type of cross examination of a defendant who chooses to testify about his version of events.

■■■ The defendant also claims that the prosecutor injected his own personal opinion into his argument. While it is error for a prosecutor to make personal representations or express personal opinions to the jury during his closing argument, *State v. Garcia, supra,* a prosecuting attorney can express an opinion based on the evidence, and when a prosecutor does this it will not be considered reversible error. *State v. McKeehan,* 91 Idaho 808, 430 P.2d 886 (1967). After examining the prosecutor's closing argument, it is apparent that he did not overstep the boundary as defined in *State v. McKeehan, supra,* by expressing a personal opinion not based on the evidence.

---

**2.** In *Hoffa,* the government was allowed to use the statements made to an undercover informant during the course of defendant's commission of a crime, jury tampering. The defendant contended that allowing the use of such testimony violated his fourth amendment right to be free from illegal searches. He argued that the informant's failure to disclose his role as a government agent vitiated any consent that the defendant had given to the informant to enter his private hotel room. The court saw no violation of the fourth amendment, saying, "The risk of being . . . betrayed by an informer . . . is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak." *Id.* at 303, 87 S.Ct. at 414, quoting from *Lopez v. United States,* 373 U.S. 427 at 465, 83 S.Ct. 1381 at 1402, 10 L.Ed.2d 462. The court went on to reject sixth amendment claims by the defendant. They also held that the use of an informer is not a *per se* violation of due process, rather the credibility of the informer himself is to be tested by the jury. The court also rejected defendant's fifth amendment claim, saying that the right to be free from self-incrimination applies only when an element of coercion is present, *i.e.,* the fifth amendment protects only against *compulsory* self-incrimination. The statements made to the informer by Hoffa were found to be completely voluntary.

**3.** We would also note that the witness himself expressly told the jury that the defendant had never mentioned the name Tony in connection with their conversations about "the boy."

■ Appellant asserts two additional alleged errors committed on behalf of the prosecuting attorney in his conduct of the cross examination of appellant. The first asserted error contained in appellant's opening brief relates to certain cross examination of defendant concerning a statement made by him on direct examination explaining why he waived extradition in California, in which the defendant stated as follows:

"Q. Well, did you come right back up here?

"A. Yes.

"Q. And why did you come right back up here?

"A. Oh, I wanted to get it straightened out. I didn't have nothing to hide. I wanted to get it straightened out."

On cross examination, the defendant appellant was asked, "Did you ever do anything to straighten this matter out after your—you came to the State of Idaho?" After an objection by his counsel was overruled, the defendant answered, "I did what I was told by my attorney."

"Q. Did you ever do anything to solve the murder of Manuel Antonio Mesa?

"A. (No response.)

"Q. Did you ever do anything?

"A. Well, how could I?"

At this point, appellant's counsel interposed an objection which was sustained by the court, and no further questions were asked along that line. Appellant asserts that the foregoing line of questions was error because it inferred that the defendant had some duty to help the police solve the crime. However, the first questions were not objected to, and therefore will not be considered on appeal. *State v. Garcia, supra.* The court sustained the defendant's objection to further questions along that line, and therefore no reversible error was committed in that exchange of questions.

■ Although not raised in his Issues Presented on Appeal, set out in his appellate brief, I.A.R. 35(a)(3), appellant in his reply brief asserts an additional error committed by the prosecutor on cross examination. The defendant was asked if, when he

was arrested, he had refused to give his name to the officers when they asked for it. Again, the cross examination was related to his direct testimony in which he testified that he had waived extradition in California and came right back to Idaho because "I wanted to get it straightened out. I didn't have nothing to hide. I wanted to get it straightened out." On cross examination he was asked:

"Q. Isn't it true that when you were arrested by Officer Elliot, and guns were drawn, he informed you that you were under arrest for murder, and he asked you your name, and you wouldn't respond with your name?

"A. I guess, I don't know. I don't remember."

Since the foregoing question was not objected to at trial it would ordinarily not be considered on appeal. *State v. Garcia, supra.* However, since, as the appellant points out, his *Miranda* rights are implicated by the question, we must consider whether the asking of that question, even though unobjected to, could constitute such a violation of his constitutional rights under *Miranda* so as to warrant our review under our fundamental error rule, as announced in *State v. Haggard,* 94 Idaho 249, 486 P.2d 260 (1971). We conclude that even if the question was erroneous in that regard, the error was not fundamental. The asserted violation is less serious than that asserted in *State v. Swenor,* 96 Idaho 327, 528 P.2d 671 (1974), in which we found no fundamental error. Nor does the extent of inquiry into silence in this case come near to the intrusion found in *State v. Haggard, supra,* or *State v. White,* 97 Idaho 708, 551 P.2d 1344 (1976), *cert. den.,* 429 U.S. 842, 97 S.Ct. 118, 50 L.Ed.2d 111. Therefore, we conclude that, no contemporaneous objection having been raised to the question, no fundamental error was committed under these circumstances with regard to the foregoing cross examination.

■ Defendant alleges that the evidence presented was insufficient to convict him of the crime charged, particularly asserting that there was no evidence of pre-

meditation. However, a review of the record indicates very substantial evidence, direct and circumstantial, pointing to the defendant's guilt of the crime of premeditated first degree murder, and thus defendant's allegations of error are unfounded. *State v. Ponthier,* 92 Idaho 704, 449 P.2d 364 (1969); *State v. Warden,* 100 Idaho 21, 592 P.2d 836 (1979); *State v. Snowden,* 79 Idaho 266, 313 P.2d 706 (1957).

 Finally, defendant alleges error in the length of the sentence assessed by the trial judge. The length of sentence to be given to a defendant upon conviction of a crime is within the discretion of the trial court. *State v. Cotton,* 100 Idaho 573, 602 P.2d 71 (1979); *State v. O'Bryan, supra.* The crime of first degree murder is punishable by death or by imprisonment for life. I.C. § 18–4004. Appellant's sentence of a fixed life term for the crime of first degree murder is well within the limits defined by statute. The record discloses a rather heinous murder, and we see no abuse of discretion on the part of the trial judge.

Affirmed.

DONALDSON, C.J., and SHEPARD and HUNTLEY, JJ., concur.

BISTLINE, Justice, dissenting.

### I.

I cannot agree with the majority's summary disposition of the defendant's claim that he was denied a fair trial because of improper cross-examination in asking questions which assumed facts not in evidence. The majority finds no error, simply stating:

"We have examined the record, and it appears that the prosecutor was attempting to establish a possible scenario of occurrences at the murder scene by asking the defendant if that was what really happened. All of the prosecutor's questions were based on possible inferences which might be drawn from facts already in evidence."

While it may be permissible to argue inferences, it is grossly improper to ask questions upon which there is no evidence as a predicate. While the jury may draw inferences from facts established, which is its province, the prosecutor cannot ask a question which assumes facts not in the record. *See McDonald v. Price,* 80 Cal.App.2d 150, 181 P.2d 115, 116 (Cal.App.1947) ("While a wide latitude should be given in cross-examination, counsel should not be allowed to assume facts not in evidence and state as positive assertions facts which if true would be detrimental to the opposing party's case and of such a nature as to inflame and prejudice the minds of the jurors".). *See also State v. Bush,* 50 Idaho 166, 175, 295 P. 432 (1930); *Hutchinson v. State,* 274 P.2d 74, 80–81 (Okl.Cr.App.1954). Being of the opinion that the nature of the prosecutor's questions and the evidence upon which those questions could have been based should be fully disclosed, pertinent portions of the testimony are set forth below.

Two individuals testified regarding the course of events that transpired at Tony Mesa's house on the night in question—the defendant and Kerry Buell. On direct examination, the defendant testified that he had gone to Tony Mesa's house that night, that he was there for 30 to 45 minutes, that he had drank a beer and talked with Tony and that he had left when a car pulled up outside. He stated:

"Well, after we talked a little bit somebody pulled up outside. Tony went out, and he was out there for probably about ten minutes. I was waiting for the wife wondering what was happening to her. Finished drinking my beer, can of beer. Walked outside, told Tony, 'Bye'. I'll see him, and I left.

. . . .

"Well, I walked up, and I walked around by the babysitter's, and their lights—it was pretty dark there, so I didn't figure—I thought maybe Roberta might still be there, but then I seen the light—it was pretty dark, so I just—I went on up to—Garrity Boulevard, and hitched a ride on home."

Tr., pp. 1597–98.

Kerry Buell testified as follows:

"Q. [BY MR. GOFF] Did you see any actions?

"A. Well, they were messing with that stuff on the table there, and I can't be sure. I even hate to even say this, because I'm not for sure, but Tony fell down, or this guy pushed him down, or something that—because anyway, Tony Mesa fell on the floor.

"Q. You could see that through the window?

"A. Yeah.

"Q. Were the curtains or drapes opened or closed on that window?

"A. They was open.

"Q. And what else did you see, if anything?

"A. And then after Tony got pushed down, you know, they was both back—he was back up again, and they was both back at that table again.

"Q. Did you see anything else?

"A. I shouldn't say pushed down, I mean, maybe he fell down, or whatever.

"Q. Okay, did you see anything else?

"A. Well, I seen one or two—one of them went back in the back room there.

"Q. Couldn't tell which one it was that went to the back room?

"A. No, and then I don't think that I really seen any more than that that I can remember.

. . . .

"Q. [BY MR. YOST] Now, you stated that you saw Tony was pushed down? He was pushed down, is that what you said?

"A. No, I said that he either fell down or he was pushed down, but I don't know how he got down. I just seen him fall.

"Q. Did you see anyone hit him?

"A. No.

"Q. And was he down on the floor?

"A. Well, when you look through the window you can't see over about three feet down.

"Q. You can't see the floor?

"A. And I seen him standing there, and I seen him go backwards and went out of sight, and then—

"Q. Did he—he just went out of sight?

"A. Like this. (Indicating)

"Q. He fell down?

"A. Yeah.

"Q. No one hit him that you could see?

"A. I couldn't see if anyone hit him or not.

"Q. What do you mean backwards? I—how did he fall?

"A. Just like you fainted, you know.

"Q. Pardon?

"A. Just like if you fainted.

"Q. Just fall over backwards?

"A. Yeah.

"Q. And after he fell over backwards did you see him get up?

"A. Yeah.

"Q. And did—what did you see then?

"A. Looked like the guy that was with him there picked him up, or bent over him, or something, and then they both came back into sight again.

"Q. The man helped him up?

"A. I don't know if he helped him up or not. The other man bent out of sight, and then they both came back up.

"Q. Well, what did you see?

"A. Pardon me?

"Q. Just tell us what you did see?

"A. I just did.

"Q. That's all?

"A. That's all.

"Q. Now, Mr. Buell, are you the same Kerry Buell that testified at the preliminary hearing—

"A. That's correct.

"Q. —the prosecutor was talking about?

"A. That's correct.

"Q. Did you think to tell us about that at the preliminary hearing?

"A. Yes. I did.

"Q. Did you tell us?

"A. No, I didn't.

"Q. You didn't say that—

"A. No, I didn't.

"Q. —at the preliminary hearing, did you?

"A. Pardon me?

"Q. You didn't say that at the preliminary hearing—

"A. No, I didn't.

"Q. —did you?

"A. No, I didn't.

"Q. And were you telling the truth at the preliminary hearing?

"A. You bet.

"Q. But you didn't tell us about that?

"A. Right.

"Q. And you are telling the truth now?

"A. You bet.

"Q. Why didn't you tell us about that at the preliminary hearing if this was so?

"A. Well, I will tell you why. This guy here, he is in a lot of trouble if he done this, and I didn't know for sure if that's what he done, and I didn't want to come in here; and I been in court a couple of times myself, and when somebody says something, whether people believe it, or hear it, or whatever, it's still in their mind and they know it, and I didn't want to say that against that guy because I didn't know if for a fact; and I didn't want to say it today, either.

"Q. And this is the truth today, now?

"A. Yes, it is.

"Q. But it—you didn't tell us when you were asked if there anything more to say—

"A. That's correct.

"Q. —at the preliminary hearing?

"A. That's correct.

"Q. Now, you—did you see a knife—

"A. No.

"Q. This other fellow had a knife?

"A. No.

"Q. You never seen this fellow before that you are talking about?

"A. No.

"Q. And then after you saw that, what you said you saw here, what did you see next?

"A. After what?

"Q. What?

"A. After what?

"Q. Well, after you saw whatever you saw, what did you see next?

"A. Then they was back at the table again.

"Q. Pardon?

"A. They were back at the table again.

"Q. They were just standing there at the table again?

"A. Yeah.

"Q. What were they doing then?

"A. They was still messing—messing in them bags.

"Q. They were just messing with the bag, and then you were still in the room in your—just looking over there; is that right?

"A. (No response.)

"Q. And then what—how long did you continue to watch them playing with the bag, or whatever they were doing with the bag?

"A. I believe I ceased watching right then.

"Q. Pardon?

"A. I believe I quit watching them right then.

"Q. You quit watching?

"A. (No response.)

"Q. Now, you weren't afraid there would be—he would fall down again?

"A. Why would I be afraid he would fall down?

"Q. Well, nothing that caused you to be interested enough in what you were seeing to—to continue to look?

"A. Well, I'll tell you, I almost went over there.

"Q. You almost went over?

"A. Yeah.

"Q. But you didn't go over, though?

"A. No, I been stuck a couple of times myself, and I just—no way.

"Q. Why do you say you have been stuck a couple of times?

"A. Well, I didn't want—

"Q. Did you know there was any knife over there?

"A. No.

"Q. Or think there was any?

"A. No, but ever since I been stabbed I have a very bad feelings about Mexican people, and being around them.

Tr., pp. 1193–94, 1207–13.

With the testimony of the defendant and Kerry Buell as a predicate, the prosecutor proceeded to cross-examine the defendant as follows:

"Q. Isn't it true that after you entered that house of Mr. Mesa's that you and Mr. Mesa was messing around with something in clear plastic bags on the table?

"A. No.

"Q. Isn't it true that you and Mr. Mesa was sitting at the table in the living room messing around with these clear plastic bags, and you became angered?

"A. No.

"Q. Isn't it true that you drew that knife from your right rear pants pocket, and stuck Mr. Mesa—excuse me—in the knees with that butcher knife as set forth in State's Exhibit Number Fifty-eight?

"A. No, it isn't.

"Q. Isn't it true that Mr. Mesa arose from that table kicking his chair over as shown on the diagram behind you with the chair laying on its side, that you came at him with the knife and as he backed up, he fell over backwards?

"A. No, it isn't true.

"Q. Isn't it true that you went over, and—as Kerry Buell said, bent over Mr. Mesa, and stabbed him in the buttocks with your knife as shown in State's Exhibit Number Sixty-one?

"A. No.

"MR. YOST: Now, I am going to object to that, Your Honor, as not only assuming facts not in evidence, but assuming facts that aren't in anyone's imagination. Mr. Buell never testified to any such a thing.

"COURT: This is cross examination, and I will permit it.

"Q. Isn't it true that after you did that, Mr. Major, that Mr. Mesa went into the bathroom?

"A. (No response.)

"Q. Yes or no?

"A. No.

"Q. And isn't it true that once he was in the bathroom he grabbed the bath towel, white bath towel, that you have seen passed around in this trial?

"A. That he grabbed it?

"Q. Yes?

"A. No.

"Q. Then isn't it true that he stayed in there for some several moments, and then came out into the hallway, and you took your knife again and struck him in the top of the scalp as shown in State's Exhibit Number Forty-eight?

"A. No.

"Q. Isn't it true that after you struck that blow to Mr. Mesa because he was drunk, and because he had lost considerable amount of blood, that he fell to the floor?

"A. No.

"Q. He fell to the floor shown in State's Exhibit Number Forty-six?

"A. (No response.)

"Q. Yes or no?

"A. No, he never fell in my presence.

"Q. And as Mr. Mesa fell, you came at him again with the knife and cut his ear and his cheek as shown in State's Exhibit Number Sixty?

"A. No.

"Q. And as Mr. Mesa was falling he raised his left arm to ward you off, and you stuck him with your knife as shown in

State's Exhibit Forty-nine, Fifty-three, and Fifty-four, in the armpit area?

"A. No, I didn't.

"Q. And isn't it true, Mr. Major, at that point you got on him and you cut his throat several times as shown in State's Exhibits Number Fifty-one—

"MR. YOST: Your Honor, I want to have the record show—

"Q. —and Fifty-four?

MR. YOST: —that our objection—

"A. No, I didn't.

"MR. YOST: —is continuing to this, and each one of these are assuming facts not in evidence. Each one of these questions are assuming facts not in evidence, are attempting to dramatize a scenario not proven in this courtroom, or offered in any—

"COURT: Sustained.

"Q. Mr. Major, did you see Tony Mesa's throat in the condition as set forth in State's Exhibit Number Fifty-two before you left?

"A. No, I didn't.

"Q. Did you see the penetration shown on the right side of Mr. Mesa's throat as shown in State's Exhibit Number Fifty-five?

"A. No.

"Q. Did you see the wounds in his chest before you left his residence as shown in State's Exhibit Number Fifty-seven and Number Fifty-six?

"A. No, I have never seen them.

"Q. And isn't it correct, Mr. Major, that you had this bath towel in your hand at one point and stood on the newspapers with your new Jarman shoes, wiped your knife with the blood towel, and threw it on the floor next to the newspapers as shown in State's Exhibits Number Forty-four?

"A. No, that's not true.

"Q. Isn't it true, Mr. Major, that after you attacked your friend, Mr. Mesa, that you then fixed some drugs?

"A. No, that's false. I never attacked Tony, and I never—never fixed any drugs.

"Q. Isn't it true, then, Mr. Major, that after you fixed your drugs by that time your wife Roberta had arrived?

"A. That's false.

"Q. And Roberta had arrived at your residence—Mr. Mesa's residence to get you to help her take that child home?

"A. No.

"MR. YOST: Your Honor, I object to this again. The jury—he is assuming facts not in proven. Just—

"COURT: Sustained.

"Q. Mr. Major, did you—how many miles is it from Mr. Mesa's house to your home at unit number nine, Charolais Motel?

"A. I don't know. I have never—I have never—

"Q. Is it accurate—

"A. —measured it in miles. Probably a couple of miles.

"Q. Is it an accurate representation by Officer Newton that it's approximately three to three and a half miles?

"A. If that's what he says, I guess—I guess it is.

"Q. And so you never helped Roberta Major carry that baby that was one years old by the name of Bambi from Mr. Mesa's house that three and a half mile walk to your Charolais Motel, unit number nine?

"A. No, not that night I didn't, no.

"MR. GOFF: Mr. Major, the last question, or near the last question asked you on direct is that you didn't commit that murder of Manuel Antonio Mesa on January 1, 1980 in the County of Canyon, State of Idaho.

"WITNESS: No, I did not.

"Q. Would you look to the jury and tell them—look into their eyes and tell them that you did not cut, strike, or stab Manuel Antonio Mesa with a knife on January 1, 1980?

"A. I never harmed Tony—Tony at all. I never—never had no reason to, either, and what they're trying to say is false.

"MR. GOFF: I have no further questions of Mr. Major."

Tr., pp. 1636–42.

The questions of the prosecutor in this case are not unlike the comments made by the prosecutor in his closing argument in the recent case of *State v. Griffiths*, 101 Idaho 163, 610 P.2d 522 (1980). In *Griffiths*, a woman was tried for second degree murder in connection with the death of her husband. The woman admitted that she had killed her husband, but claimed that she had acted in self-defense. In his closing argument in *Griffiths*, the prosecutor described a scenario in which the dying husband was on his knees, totally helpless and begging for mercy, while his wife continued to fire shots into his body. A somewhat more candid Court in *Griffiths* recognized that the prosecutor had been guilty of misconduct, having "referred to facts which were not in evidence," 101 Idaho at 166, 610 P.2d at 525, but nevertheless went on to hold the error harmless, stating that "in view of the verdict of involuntary man-slaughter, the closing argument of the prosecutor could not have contributed to that verdict." 101 Idaho at 167, 610 P.2d at 526.

Remarkably, the majority in this case finds no error, although as in *Griffiths*, the scenario described by the prosecutor cannot be said to have been based upon facts already in evidence.[1] The misconduct in this case is even more egregious, however, because the scenario which the prosecutor attempted to describe was set forth not only in his closing argument, but in questions to the defendant as well. The defendant during cross-examination was repeatedly forced to state that what the prosecutor said happened was not true. Thus, by arguing in closing that the defendant was not a credible witness, which no doubt suggested to the jury that the defendant may have lied when he denied that what the prosecutor stated had occurred, the prosecutor was able to create an inference that his, the prosecutor's, description of what transpired, was what actually occurred.[2]

1. One might wonder at the different conclusion regarding the prosecutor's conduct in this case and that in *Griffiths*. It might be explained by the Court's wish to reach its desired result—affirming Mr. Major's conviction for first degree murder. Although the Court in *Griffiths* found error in the prosecutor's conduct, it was somehow able to say the error was harmless because the defendant in that case was convicted only of manslaughter—as opposed to second degree murder. 101 Idaho at 167, 552 P.2d at 526. However, that rationale could not be applied in this case, the jury having convicted Mr. Major of murder in the first degree.

2. "We testified and determined the fact that Kerry Buell said they were talking at the table, and doing something with some plastic bags. They got up and there was a struggle, or a push, or just fell backwards, and Mr. Major bent over and helped him up, or pulled him up, and that one of them went to the bathroom, and grabbed a bloody—a bath towel, white bath towel, to try to stop the bleeding; only to come out a few moments later into the narrow hallway of his house, Mr. Mesa, and to be met again by the defendant swinging his knife.

"It was stated in voir dire at the beginning of this trial that the credibility of the witnesses is one of the most important factors, and functions of a jury. Credibility requires that—any time we have a trial, we are going to have different versions of the story, and you must decide the credibility, and base that decision of credibility and the weight that you are going to give to the testimony of any witness upon those factors which the Court has instructed you is proper to consider.

"During voir dire the state brought to your attention that its witnesses would·be felons, et cetera. The defendant's attorney quoted that I—there are other problems of the defendant's witnesses—state's witnesses, an impediment of the state's witnesses. However, at no time during voir dire was the jury ever informed that the defendant also had those impediments.

"The defendant took the stand today. The Court has instructed you that you consider his testimony as you do any other witness, and one of those factors in considering the credibility and the weight you give his testimony is whether or not he has been convicted of a felony.

"You were further instructed to consider the witnesses' opportunities to observe, their bias, prejudice, and interest in the outcome of this trial. It should be obvious to you as it is, I think, to most, that the defendant certainly is and should be biased and interested in the outcome of this trial, but it should also become obvious to you that not one single witness of the state is interested in the outcome of this trial other than that justice be done."

. . . .

What transpired at trial in this case is not surprising. The Court's opinion in *Griffiths* having been released before the commencement of the trial in this case, the prosecutor was no doubt cognizant of the fact that even if he engaged in improper conduct at trial it would be unlikely to result in the reversal of any conviction obtained. The Court's holding in *Griffiths* that the prosecutor's misconduct was harmless error in effect granted a license to overzealous prosecutors to engage in unfair trial tactics. The result is clear: the same sort of prosecutorial misconduct which denied Thelma Griffiths a fair trial, today is allowed to deny Melvin Major the same. While aspiring young prosecutors cannot be overly-faulted for employing tactics which this Court tolerated in *Griffiths* and today directly sanctions, they would do well to remember the words of this Court in *State v. Givens*, 28 Idaho 253, 268, 152 P. 1054, 1058 (1915):

> "It is the duty of the prosecutor to see that a defendant has a fair trial, and he should never seek by innunendo or inference to pervert the testimony, or make statements to the jury which, whether true or not, have not been proved. The desire for success should never induce him to obtain a verdict by argument

based upon anything except the evidence in the case and the conclusions legitimately deducible from the law applicable to the same."

(Quoted in *State v. Owen*, 73 Idaho 394, 408, 253 P.2d 203, 211 (1953), and in *State v. Griffiths*, 101 Idaho 163, 168, 610 P.2d 522, 527 (1980) (Bistline, J., dissenting).)

II.

The Court in my opinion also fails to adequately address the defendant's contention that the prosecutor improperly questioned him on cross-examination regarding his post-arrest silence. The Court states that "even if the question was erroneous in that regard, the error was not fundamental." As support for this conclusion, the Court states that the asserted violation in this case is "less serious" than that asserted in *State v. Swenor*, 96 Idaho 327, 528 P.2d 671 (1974). *Swenor* is inapposite. In that case the Court did not even mention the fundamental error rule, the Court concluding, although the issue in question had not been properly raised on appeal, that *no error* had occurred at trial. The majority also supports its conclusion that no fundamental error occurred by stating that "the extent of inquiry into silence in this case [does not]

And then there was some discussion about Kerry Buell. I think that it should have become obvious to you, ladies and gentlemen of the jury, that Kerry Buell, from his testimony, saw more than he is going to tell you about, and he told you why he is not going to tell you about it. He said, 'I didn't want to get involved', and how do you know that he saw more than he told you? Because he said, 'I looked over there at my friend's house. I was supposed to be watching his house. I saw them come in there. I saw them struggling. I saw them fall, Mr. Mesa fall,' and he said, 'I even thought about going over there, but I didn't want to get stuck'. What does that mean to you? What does that statement mean to you, 'That he didn't want to get stuck'? And then he said later on cross examination, 'I never paid any attention after that to Mr. Mesa's house'. Why didn't he pay any attention after he had been asked. "You will have to answer those questions. I can submit to you the answers. He knew there was no need. He didn't want to get involved. He knew his friend Tony Mesa was no longer alive.

"And last, the defendant argued that even after looking at these atrocious and brutal and whatever adjective you might want to place on those photographs, and those bloody clothes that defendant, under oath, at my request, and I felt it was a kind request, look—'Mr. Major, look the jury in the eye. Tell the jury you didn't kill your friend, or murder Mr. Mesa', and then I asked you— Mr. Yost says that he looked you right in the eyes. I ask you where those eyes were? I ask you where Mr. Major's eyes were when I said that? Who was he staring at standing right over here, (indicating)? Who did he give an evil look to here?

. . . .

"The defendant would have you believe it's unfortunate, and unreasonable set of circumstances that points that finger of guilt to him. I submit to you that that set of circumstances only came, and was presented to you through a long thorough investigation."
Tr., pp. 1667–68, 1705–06, 1707.

come near to the intrusion found in *State v. Haggard,* [94 Idaho 249, 486 P.2d 260 (1971)] or *State v. White,* 97 Idaho 708, 551 P.2d 1344 (1976)." However, the nature of the intrusion in question—the improper use of the defendant's post-arrest silence to raise an inference of guilt—causes me to believe that fundamental error occurred in this case. The same type of intrusion occurred in *Haggard* and *White,* and the Court held in both cases that fundamental error resulted. The majority attempts to distinguish these cases on the ground that a greater intrusion on the right to silence occurred because the defendant in each case was asked several questions regarding his silence. Certainly it cannot be denied that the same inference of guilt may arise if a defendant is asked a single question regarding his silence as when he is asked several such questions. This is particularly true when, as in this case, the prosecutor in his closing argument specifically directs the jury's attention to the defendant's silence. The reasoning of the Court in *White* is persuasive: "If a prosecutor is allowed to introduce evidence of silence, for any purpose, then the right to remain silent guaranteed in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), becomes so diluted as to be rendered worthless." 97 Idaho at 715, 551 P.2d at 1350–51.