777 P.2d 1226

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Wilburn Arthur SMITH, Defendant–Appellant.**

No. 17334.

Court of Appeals of Idaho.

July 12, 1989.

Petition for Review Denied
Aug. 28, 1989.

John C. Judge, Siebe, Landeck, Westberg & Judge, Moscow, for defendant-appellant.

Jim Jones, Atty. Gen. by Peter C. Erbland, Deputy Atty. Gen., Boise, for plaintiff-respondent.

BURNETT, Judge.

This case presents a potpourri of issues relating to a conviction of first degree burglary and to a determination that the defendant is a persistent violator. The convicted defendant, Wilburn Smith, asserts that his trial on the burglary charge was tainted by a denial of due process because (1) the court admitted unreliable identification testimony; (2) an alleged accomplice invoked the Fifth Amendment privilege, frustrating Smith's right of cross-examination; and (3) an accumulation of errors resulted in an unfair trial. With respect to the persistent violator determination, Smith contends (1) that the court erroneously allowed the state to amend its information after it had rested its case on the burglary charge; (2) that the jury who convicted him of the burglary should not also have determined his persistent violator status; (3) that the prior felony convictions supporting the persistent violator determination should have been treated as a single conviction; (4) that the state failed to prove the prior crimes actually were felonies; and (5) that the judge gave burden-shifting instructions to the jury. Although these contentions have been well presented by able counsel, we conclude, for reasons set forth below, that the judgment of conviction should be affirmed.

We preface our analysis with a brief synopsis of the facts. One evening an officer of the Moscow City Police responded to a burglary alarm at a business known as The Bowlerama. As he peered through a window, the officer saw someone opening pinball machines. He then looked through the doorway and came face-to-face with a man he later identified as Smith. The man fled from the building and ran past another policeman, who was off duty and walking home at the time. This officer gave chase but was unable to catch the fleeing suspect. However, the officers did arrest an apparent accomplice, Kenneth Allen, on the premises. When Allen was arrested, the officers found and seized a number of burglary tools.

Approximately two months later, Smith was arrested in Washington and charged with the burglary in Moscow. Both officers identified him in a photo lineup. At trial, the officers identified Smith in court as the man they had seen at the Bowlerama. The apparent accomplice, Allen, also testified as a government witness. The jury found Smith guilty as charged. After a subsequent evidentiary hearing, the jury further found that Smith was a persistent violator of the law. The district judge im-

posed a ten-year prison term with a seven-year minimum period of confinement. This appeal followed.

## I

We first deal with Smith's challenge to his conviction of the burglary. The challenge is predicated upon several asserted denials of due process.

## A

Smith contends that the line-up identifications and the in-court identifications by the police officers were unreliable. He notes that each identification was based upon a brief encounter under poor lighting conditions at the Bowlerama. However, this argument would go to the weight, rather than to the admissibility, of the identification testimony. A viable issue of admissibility would exist only if the in-court identification had been tainted by an unnecessarily suggestive pretrial identification. A defendant's due process right may be violated by such tainted evidence. *See generally State v. Kay*, 108 Idaho 661, 701 P.2d 281 (Ct.App.1985).

■ In determining whether a defendant's due process right has been abridged in this manner, we conduct a two-tiered inquiry. First, we examine the totality of circumstances to discern whether the pretrial identification procedure was in fact unnecessarily suggestive. *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). If we find the procedure was not suggestive, our inquiry ends. However, if the procedure was unnecessarily suggestive, we then inquire whether the resulting pretrial and in-court identifications were so tainted that they should have been excluded. *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). In this second inquiry we determine whether the suggestiveness of the pretrial procedure was outweighed by independent indicia of reliability. *Id.* at 114, 97 S.Ct. at 2253; *State v. Edwards*, 109 Idaho

501, 504, 708 P.2d 906, 909 (Ct.App.1985). The primary evil to be avoided is a "very substantial likelihood of irreparable misidentification." *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972).

■ Here, we need not go beyond the first inquiry. Smith has offered no evidence that the pretrial photo lineup was suggestive. Each officer was separately shown a lineup photograph depicting eight white males with facial hair. We have examined the photograph and see nothing suggestive about it. Without hesitation, both officers identified Smith from the photo display. Accordingly, we hold that the district court correctly admitted evidence of the lineup identifications and the ensuing in-court identifications.

## B

Smith next argues that he was denied due process when his alleged accomplice invoked the Fifth Amendment testimonial privilege while appearing as a witness for the prosecution. The point is a subtle one, for it is not always readily apparent how a defendant can be prejudiced by an alleged accomplice's silence. However, the circumstances surrounding the invocation of privilege may give rise to an inference unfavorable to the defendant, who then is unable to attack the inference through cross-examination. *See generally State v. Major*, 105 Idaho 4, 665 P.2d 703 (1983).

■ In such a case, a due process violation may be premised on either of two theories. First, the deprivation may be "based upon a concept of prosecutorial misconduct, when the government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege." *Namet v. United States*, 373 U.S. 179, 186, 83 S.Ct. 1151, 1154, 10 L.Ed.2d 278 (1963). Second, a denial of due process may be grounded upon a "conclusion that, in the circumstances of a given case, inferences from a wit-

ness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." *Id.* at 187, 83 S.Ct. at 1155.

Ordinarily, in cases where reversible error is found, both prosecutorial misconduct and unfair prejudice to the defendant are reflected in the record. *State v. Major,* 105 Idaho at 8, 665 P.2d at 707. However, the United States Supreme Court has not held that both factors are essential. On the contrary, the Court in *Namet* explicitly addressed prosecutorial misconduct and unfair prejudice as separate grounds for reversal. *See also Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965) (analyzing similar issue under confrontation clause of the Sixth Amendment, and reversing judgment of conviction without discussing prosecutorial misconduct).

This approach is consistent with a recent trend in criminal procedure away from focusing on subjective prosecutorial motives and toward an objective determination of whether a defendant has received a fair trial. For example, in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court held that the state must disclose evidence which creates a reasonable doubt of the defendant's guilt, even if the defendant has not specifically requested such information. In so holding, the Court observed that this constitutional obligation is not measured by "the moral culpability, or the willfulness, of the prosecutor." *Id.* at 110, 96 S.Ct. at 2400. Another illustration is provided by decisions holding that a defendant may be granted a new trial if a material witness has committed perjury, regardless of whether the state knowingly elicited the perjury. *See, e.g., Sanders v. Sullivan,* 863 F.2d 218 (2d Cir.1988). These cases recognize that the fundamental purpose of due process is to give the accused a fair trial, not merely to regulate the conduct of prosecutors.

Consequently, the issue in this case is twofold: whether the prosecutor knew or had reason to know the accomplice would invoke his Fifth Amendment privilege and, even if the prosecutor did not anticipate the event, whether the witness' invocation of privilege added such critical weight to the prosecutor's case that Smith was unfairly prejudiced. The full course of the witness' testimony was as follows:

Q For the record, and for the jurors, your name is Kenneth Lewis Allen; is that correct?

A That is correct.

Q You have pled guilty to the crime of First Degree Burglary in Case No. C–786; is that right?

A That is correct.

Q In fact you burglarized the Bowlerama on June 5th, 1987?

A That's correct.

Q Is that correct?

A That's correct.

Q And you were caught by police officers inside the building; is that also correct?

A That's correct.

Q And you entered the building through the roof; did you not?

A Yes.

Q And someone else was inside that building with you on June 5th, 1987—June 5th, 1987; is that correct?

A That is correct.

Q And that person was also committing the crime of burglary; is that correct?

A That is correct.

Q And that person escaped; is that right?

A That's right.

Q On the evening of the 4th of June, 1987, you and the defendant Wilburn Arthur Smith checked into the Mark IV motel here in Moscow; didn't you?

A I ... [r]efuse to answer.

Q On what grounds, sir?

A The Fifth Amendment.

After this exchange the jury was excused. Allen did not testify again in front of the jury.

Smith has argued vigorously that the prosecutor knew in advance that Allen would invoke his Fifth Amendment privilege. Indeed, during an out-of-court conference prior to the aborted testimony, Allen indicated that he would refuse to testify. He claimed his testimony at trial might vary from his prior testimony at a probable cause hearing, exposing him to a possible charge of perjury. However, the prosecutor had granted Allen transactional immunity for any answers to questions which also had been asked at the probable cause hearing. Consequently, the prosecutor had no apparent reason to expect that Allen would insist on continuing to assert his privilege. In fact, after Allen invoked the Fifth Amendment, the trial judge endeavored to compel his testimony. This effort ultimately was fruitless because Allen invoked the privilege upon the additional ground that his testimony might subject him to out-of-state charges from which no Idaho prosecutor could grant immunity. Upon this record, we cannot conclude that the prosecutor engaged in misconduct by calling Allen as a witness.

The next inquiry is whether Allen's invocation of privilege was of such significance in the trial that it created reversible error even in the absence of prosecutorial misconduct. We think not. The state's case against Smith was anchored in the untainted testimony of the police officers, identifying him as one of the individuals observed at The Bowlerama during the burglary. The question Allen refused to answer—whether he had shared a motel room with Smith before the burglary—was not a central issue in the case. Moreover, the district judge gave the jury a curative instruction, admonishing them not to draw any inference from Allen's invocation of privilege. Upon this record, we are unable to conclude that the invocation of privilege added critical weight to the prosecutor's case and thereby unfairly prejudiced Smith.

### C

Smith argues that if the invocation of privilege did not create reversible error

by itself, it contributed to cumulative error depriving him of a fair trial. In *State v. Campbell*, 104 Idaho 705, 662 P.2d 1149 (Ct.App.1983), we explained the cumulative error doctrine. An accumulation of irregularities, each of which is inconsequential standing alone, may in the aggregate produce an unfair trial.

Although Smith has asserted several other irregularities, the only one meriting discussion here occurred when the prosecutor called a third police officer as a witness, asking him whether Smith had anything in his possession when he was arrested in Washington. Evidently, the witness had not been the arresting officer. He did not have personal knowledge of the circumstances surrounding the arrest. Nevertheless, he answered that when Smith was arrested, he was in possession of Allen's car. Defense counsel promptly objected. The trial judge sustained the objection, correctly noting that the testimony was not based on personal knowledge and that it appeared to be hearsay. The prosecutor withdrew the question, and nothing more was said about the car during the remainder of the trial.

We are not persuaded that this incident, coupled with Allen's invocation of privilege, resulted in an unfair trial. Neither of these irregularities flowed from any erroneous ruling by the trial judge. Indeed, the judge handled each event properly. Moreover, neither irregularity was directly related to the heart of the state's case—the two officers' identifications of Smith as the man observed at The Bowlerama. Smith questioned these identifications through cross-examination; however, he did not testify, nor did he present any other evidence, to rebut the officers' testimony.

The jury deliberated approximately two and one-half hours before finding Smith guilty of the burglary. At one point during the deliberations the jury sent a note to the trial judge, asking whether the officers who identified Smith had filed police reports and, if so, whether the reports described Smith's physical characteristics.

The judge correctly responded that the case was to be decided on the evidence presented, which did not include such police reports. Although Smith argues that this inquiry reflected juror skepticism about the officers' identifications, the argument is purely speculative. The inquiry might also have reflected juror curiosity or an effort to exhaust all possible sources of reasonable doubt. In any event, Smith's argument establishes no nexus between the irregularities at trial and the central issue of identification. We are convinced beyond a reasonable doubt that the irregularities, even when viewed cumulatively, did not affect the outcome of the trial. Accordingly, we uphold the burglary conviction.

## II

We now examine the issues Smith has raised concerning the determination of persistent violator status. The issues are both procedural and substantive.

### A

■ The first procedural question is whether the prosecutor should have been allowed to amend that portion of the information which alleged persistent violator status, after the state had rested its case on the burglary charge. Rule 7(e), I.C.R., provides as follows:

> The court may permit a complaint, an information or indictment to be amended at any time before the prosecution rests if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced.

Smith argues that the rule broadly prohibits any amendment to an information after the state rests its case on the offense charged. However, we think it is more accurate to say that the rule prohibits an amendment after the state has rested its case on the subject matter of the amendment. Thus, the state may not alter a charge, or add new charges, after the close of evidence.

Here, the state did not alter any charge, nor did it charge any new offenses. Rath-er, the state merely enlarged its list of prior convictions upon which the persistent violator allegation was based. At that time, the separate evidentiary hearing on persistent violator status had just begun. Smith had been on notice throughout the proceedings that the state would undertake to prove his persistent violator status if and when he was found guilty of the burglary. He has not shown how he was unfairly surprised by this amendment. We find no error in allowing it.

### B

■ Smith next argues that a jury other than the jury who convicted him of the burglary charge should have been seated to determine his persistent violator status. We disagree. Although the state must allege persistent violator status in the prosecutor's information, that allegation is not read to the jury unless the defendant is found guilty of the crime(s) charged. I.C.R. 7(c). Moreover, persistent violator status is not a separate crime; it is simply a determination that broadens a judge's sentencing options. *See* I.C. § 19–2514. Here, it is not at all clear that Smith's ten-year sentence was affected by the persistent violator determination. He could have received up to fifteen years for the first degree burglary regardless of persistent violator status. I.C. § 18–1403.

In any event, we have been cited no authority suggesting that a defendant is constitutionally entitled to one jury for the trial on the criminal charge(s) and another jury for matters pertinent to sentencing. The Idaho Supreme Court has enunciated the procedures to be followed in a persistent violator hearing. The Court has recognized that the trial jury may later determine whether the defendant is a persistent violator. *State v. Wiggins*, 96 Idaho 766, 536 P.2d 1116 (1975). We hold it was not error to afford Smith a single jury.

### C

■ Smith's next issue is substantive in nature. He contends that the convictions

upon which the persistent violator allegation was based should have been treated as evidence of a single felony because all of the convictions were adjudged on the same day. In *State v. Brandt*, 110 Idaho 341, 715 P.2d 1011 (Ct.App.1986), we acknowledged that several convictions entered the same day, or deriving from the same prosecutor's information, ordinarily should not be treated as multiple prior felonies. However, we went on to say that "the nature of the convictions in any given situation must be examined to make certain that [this] general rule is appropriate." *Id.* at 344, 715 P.2d at 1014.

Here, Smith's convictions were for separate crimes perpetrated on separate victims. They consisted of two burglaries in different counties, and one escape from a jail. These convictions were for distinguishable incidents of criminal conduct. Consequently, it was permissible to treat them as evidence of multiple prior felonies.

### D

■ Smith next argues that the state failed to prove each element of the persistent violator allegation because it did not wholly eliminate a possibility that the prior crimes were misdemeanors, rather than felonies, when he committed them. We disagree. At trial, the state not only adduced documentary evidence that Smith had been convicted of certain crimes; it also submitted to the jury copies of the statutes defining the crimes, along with the statutes' legislative history.

In deciding to charge Smith as a persistent violator, the state was required to ascertain that his prior crimes were indeed felonies when committed. *See generally State v. Williams*, 103 Idaho 635, 647, 651 P.2d 569, 581 (Ct.App.1982). However, in making a prima facie presentation to the jury, the state did not have the burden, *sua sponte*, of disproving a speculative and unasserted possibility that the statutes had been amended some time after commission of the crimes, changing misdemeanors into

felonies. Nor did the state have an initial burden of locating the code books in existence when the prior crimes were committed, and of making copies of the statutes directly from those books, in order to negate such an inchoate possibility.

Rather, in its prima facie presentation, the state needed only to produce copies of judgments specifically identifying the crimes as felonies, or—if the judgments were not so specific—to offer admissible copies of the felony statutes applicable to the crimes recited in the judgments. If Smith thought the judgments were in error, that the proferred statutes were not actually applicable, or that the statutes did not define the crimes as felonies at pertinent times, these were matters of defense for him to raise. Had he done so, the state would have been required to meet the issues thus framed, and to carry the ultimate burden of proof.

■ However, no such issue was framed in this case. Smith did not make any threshold showing that the state had presented erroneous judgments or had relied upon improper statutes. Moreover, as we have noted, the state submitted the legislative history of each pertinent statute. In doing so, it negated any potential defense based on possible statutory amendments, and it more than satisfied its ultimate burden of proving the existence of the prior felonies.

### E

■ Finally, Smith argues that the jury instructions erroneously shifted to him the burden of proving that his prior convictions were *not* felonies. This argument is closely related to the issue just discussed. As we have noted, the state met its affirmative burden of proof. In addition, the judge instructed the jurors that Smith could be found a persistent violator only if they determined upon the evidence presented that two or more of Smith's prior convictions had been felonies. This was a correct statement of the law. Having reviewed

the instructions as a whole, we do not find them to harbor a burden-shifting defect.

The judgment of the district court, convicting Smith of first degree burglary and determining him to be a persistent violator, is affirmed.

WALTERS, C.J., and SWANSTROM, J., concur.